## MITCHELL, SECRETARY OF LABOR, *v.* BUDD ET AL.

No. 278. Argued February 29–March 1, 1956.—Decided March 26, 1956.

*Bessie Margolin* argued the cause for petitioner. With her on the brief were *Solicitor General Sobeloff, Stuart Rothman* and *James R. Billingsley.*

*Milton C. Denbo* argued the cause for J. T. Budd, Jr. & Co. et al., respondents. With him on the brief was *Philip Levy.*

*Mark F. Hughes* argued the cause and filed a brief for the May Tobacco Co., respondent.

Briefs of *amici curiae* urging affirmance were filed by *John H. Todd, M. Richard Garstang* and *Joseph O. Parker* for the National Grange et al., and *Martin Burns* and *Allen Lauterbach* for the American Farm Bureau Federation.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

These are actions brought by the Secretary of Labor under § 17 of the Fair Labor Standards Act, 52 Stat. 1060, 63 Stat. 910, 29 U. S. C. § 201, to enjoin respondents from violating the minimum wage, § 6, and record-keeping provisions, § 11, of the Act. The employees concerned work in tobacco-bulking plants operated by respondents in Quincy, Florida, which has a population in excess of 2,500. Respondents claim these employees are exempt from the Act. The District Court ruled against the respondents. 114 F. Supp. 865. The Court of Appeals reversed. 221 F. 2d 406. We granted certiorari, 350 U. S. 859, because of the importance of the problems presented and of the apparent conflicts between the decision below and *Tobin* v. *Traders Compress Co.,* 199 F. 2d 8, and *Maneja* v. *Waialua Agricultural Co.,* 349 U. S. 254.

The processing operations involve U. S. Type 62 Sumatra tobacco, a leaf tobacco used exclusively for cigar wrappers. This type of tobacco requires special cultivation. It is grown in fields that are completely enclosed and covered with cheesecloth shade. The leaves of the plant are picked in stages, as each matures. The leaves are taken immediately to a tobacco barn, located on the farm, where they are strung on sticks and dried by heat. Before the drying process is completed, the leaves are allowed to absorb moisture. Then they are dried again. There is some fermentation at this stage. But the treat-

ment in the tobacco barns is essentially a drying operation during which the moisture content is reduced to between 10% and 25%.

At the end of the drying operation, the leaves are packed in boxes and taken from the farm to a bulking plant for further processing. At the bulking plant, the leaves are placed in piles, known as "bulks," aggregating from 3,500 to 4,500 pounds of tobacco. This is the "sweating" or fermentation process, which requires carefully controlled regulation of temperature and humidity. Proper heat control includes, among other things, breaking up the bulk, redistributing the tobacco, and adding water. Proper fermentation or aging requires the bulk to be reconstructed several times. The bulking process lasts from four to eight months, after which the tobacco is baled. The bulking process requires a large amount of equipment, including a steam-heated plant, platforms, thermometers, bulk covers, baling boxes and presses, baling mats and packing, sorting and grading tables. The bulking process substantially changes the physical properties and chemical content of the tobacco, improving the color, increasing combustibility, and eliminating the rawness and harshness of the freshly cured leaf.

The overwhelming majority of farmers in the region in litigation in this case have their tobacco processed by others. In that region there are 300 farmers who grow this type of tobacco. Of these, only 9 maintain and operate bulking plants; and only 5 maintain and operate bulking plants processing tobacco grown only by themselves. It appears that bulking cannot be economically done by the ordinary small farmer growing less than 100 acres. Of the 300 farmers in the present group, 80% grow less than 25 acres per year, while the majority grow from 1½ to 10 acres a year.

Respondent Budd grows no tobacco itself and confines its operations to processing the tobacco grown on 263

acres by 52 farmers. Budd employs about 108 workers for bulking, sorting, grading, and baling tobacco.

Respondent King Edward processes in the bulking plant involved in this litigation only tobacco produced on farms operated by it. (It has two other bulking plants that process tobacco purchased from other growers.) The bulking plant involved here is about 13 miles from King Edward's farms. A majority of the 120 employees in the bulking plant also work on King Edward's farms.

May has its own bulking plant and processes there only the tobacco which it grows on its own farms. This plant is about 10 miles from the farms. The employees, who work the farms, work in the bulking plant, being transported back and forth by May. Seventy are employed in the bulking plant.

*Area of Production.*—Section 13 (a) of the Act creates several exemptions from the minimum wage and maximum hours provisions of the Act. One of those exemptions contained in § 13 (a)(10) includes:

> "any individual employed within the area of production (as defined by the Administrator), engaged in handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, or in making cheese or butter or other dairy products."

The Administrator's definition of "area of production" provides that a plant is within the "area of production" if it is located (1) "in the open country or in a rural community," which is defined as not including "any city, town or urban place of 2,500 or greater population," and (2) within a specified mileage distance from the source of 95% of its commodities.[1]

_____
[1] The entire regulation is set forth in the Appendix to this opinion, *post*, p. 482.

The Court of Appeals, following its earlier decisions in *Jenkins* v. *Durkin,* 208 F. 2d 941, and *Lovvorn* v. *Miller,* 215 F. 2d 601, held that the regulation was invalid. It concluded that once "geographic lines of the area of production have been established, the act makes the exemption effective within that area," and that any qualification by reason of size of the town where the establishment is located is invalid. 215 F. 2d, at 603. For that conclusion the Court of Appeals found comfort in *Addison* v. *Holly Hill Fruit Products, Inc.,* 322 U. S. 607.

*Holly Hill* involved one of the alternative definitions of "area of production." That alternative defined "area of production" in geographic terms and then added another standard—whether the employee was in an establishment having no more than seven employees. We held that ". . . Congress did not leave it to the Administrator to decide whether within geographic bounds defined by him the Act further permits discrimination between establishment and establishment based upon the number of employees." *Id.,* at 616. We said that the phrase "area of production" had "plain geographic implications" with which the size of a plant within the area was not consistent. *Id.,* at 618. That definition, therefore, was struck down. But its alternative, substantially the one that is involved here, was not passed upon. In fact, we reserved decision in *Holly Hill* as to whether the population criterion, now presented for decision, was valid. *Id.,* 610.

We think the present regulation is a valid definition of "area of production." We think it valid by the standard we used in *Holly Hill.* In that case we said that ". . . 'area' calls for delimitation of territory in relation to the complicated economic factors that operate between agricultural labor conditions and the labor market of enterprises concerned with agricultural commodities and

more or less near their production." *Id.*, at 613–614.
The aim of Congress was to exempt employees "employed
in agriculture," § 13 (a)(6), and those engaged in agricul-
tural enterprises in the "area of production," § 13 (a)(10).
That meant drawing a line between agricultural enter-
prises operating under rural-agricultural conditions and
those subject to urban-industrial conditions. An indi-
vidual working in an agricultural packing plant on the
edge of Los Angeles is in a strikingly different environment
from one doing the same work in a small town in the
heart of Kansas. Nearness to a large city has relation
to the problem of the Administrator in making his defini-
tion. For the proximity of the plant to a metropolitan
center, like the size of the town where the plant is located,
may make the decisive difference between an agricultural
and an urban environment.[2] Likewise, nearness of the
plant to its supplies cannot be considered an irrelevancy.
For "area" is understandable in terms of nearness and

---

[2] On this phase of the problem the Administrator said in his find-
ings dated December 18, 1946:

"Although it is clear that any line attempting to distinguish between
'urban-industrial' and 'rural-agricultural' communities on the basis
of population can at best be only an approximation, it is equally
clear that none of the proposals advanced at the hearing would
accomplish the objectives of such a test with as much accuracy as
the 2,500 population test. As a class, places of 2,500 population or
more are predominantly industrial, while places with populations of
less than 2,500 are predominantly agricultural. A population limit
of 2,500, moreover, has for over 35 years been the official dividing
line between 'rural' and 'urban' employed by the Bureau of the
Census in its studies. This dividing line has also been accepted and
used in studies made by the Bureau of Agricultural Economics, the
Federal Emergency Relief Administration, the Works Progress Ad-
ministration and other government agencies. It has furnished the
definition of 'rural' communities which has been the basis of studies
of rural and urban communities by many sociologists. It has been
incorporated into statute by the Congress of the United States in

farness. Distance is an important factor in any formula which seeks to treat more or less as a unity labor on farms and labor in agricultural enterprises in the "area of production." [3]

---

special legislation for rural communities.[*] To a very great extent the handling and processing of agricultural and horticultural commodities is carried on in the open country or in towns of less than 2,500. For example, only about 10% of grain elevators are located in towns of 2,500 or more. Only about 11% of cotton gins are located in such populated places. About two-thirds of all fresh fruit and vegetable canning and packing, cheese manufacturing and poultry and egg assembling are carried on in the open country or in towns of 2,500 or less.

"On the basis of all the evidence, it is my conclusion that a population test of 2,500, while not drawing a line between 'urban-industrial' and 'rural-agricultural' conditions with a fine precision, will come as close to accomplishing this objective as it is possible to come in a general rule applicable to many situations."

[*]The references were to 39 Stat. 356, 40 Stat. 1200.

[3] On this phase of the problem the Administrator said:

"The selection of appropriate distances for the different commodities and groups of commodities has been no easy task, and was accomplished only after carefully weighing and synthesizing a large variety of complicated economic factors. Among the many factors taken into consideration were the following: the kind of crop; the distances from which the establishments in each industry receive the agricultural or horticultural commodities upon which they perform the operations specified in the pertinent sections of the Act; the geography and topography of the various sections of the country in which the different commodities are normally produced; the location of the plants within these areas; the concentration of cultivation of the different commodities in various sections of the country; the pattern of concentration of agricultural production with respect to the location of the establishment; differences in practice as between single crop areas and diversified farming areas; the perishability of the commodities received; the extent to which the plants deal with a single commodity rather than a variety of commodities; the nature of the operations performed on the commodities received, including

No definition of "area of production" could produce complete equality, for the variables are too numerous. The Administrator fulfills his role when he makes a reasoned definition. See *Gray* v. *Powell,* 314 U. S. 402, 411. On no phase of this problem can we say that the Administrator proceeded capriciously or by the use of inadmissible standards. Experts might disagree over the desirability of one formula rather than another. It is enough for us that the expert stayed within the allowable limits. We think he did here and that the definition of "area of production" under § 13 (a)(10) is a valid one.

*Agriculture.*—The Court of Appeals held that the employees in the bulking plants of King Edward and May were exempt under § 13 (a)(6) which covers "any employee employed in agriculture." It relied on the broad definition of "agriculture" contained in § 3 (f) of the Act which provides, in relevant part, that the term "includes farming in all its branches and among other things includes . . . any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to . . . market or to carriers for transportation to market." The work in the bulking plants, the court ruled, was "preparation for market" within the meaning of § 3 (f).

The exemption of § 13 (a)(6) read with § 3 (f) covers large operators as well as small ones, as we recently said in *Maneja* v. *Waialua Agricultural Co., supra,* at 260. It also includes "extraordinary methods" of agriculture as well

the degree of industrialization of the various operations; the number of hands or operations through which the particular commodity has moved since leaving the farm, including the possibility of passing increased labor costs back to the farmer; the marketing practices of the particular industries; and the wage rates paid, and overtime practices in the various communities concerned with particular commodities."

as the more conventional ones.  *Id.*, at 261.  The question in the *Waialua* case was whether sugar milling was included in the agriculture exemption of § 13 (a)(6). We said that it was necessary to look to all the facts surrounding the process to determine whether that process was incident to farming.  *Id.*, at 264–265.  We held that sugar milling was not, even when done by the grower. We think like considerations indicate that in this case the agriculture operation does not extend through the bulking plants but ends, as the District Court ruled, with the delivery of the tobacco at the receiving platform of the bulking plant.  That is the "delivery . . . to market" within the meaning of § 3 (f) of the Act.

It is true that King Edward and May are farmers and process in their bulking plants only the tobacco they raise. It is also true that many employees who work their farms also work in their bulking plants.  These are heavily stressed as indicia that bring the bulking plants into the agriculture exemption.  But there are two other factors which in our view tip the scales the other way.

First, tobacco farmers do not ordinarily perform the bulking operation.  As already mentioned, of the 300 farmers who grow this type of tobacco in this area, only 9 maintain and operate their own bulking plants.  The remaining farmers have their crops processed by others. The bulking operation is for the most part divorced from the cultivation of tobacco and from the drying operation in the tobacco barns on the farm.  The bulking process for the most part is a separate processing stage.

Second, the bulking operation is a process which changes the natural state of the freshly cured tobacco as significantly as milling changes sugar cane.  As indicated above, the bulking process changes and improves the leaf in many ways and turns it into an industrial product. What we said in *Waialua* concerning sugar milling is apt here: a process that results in such important changes is

"more akin to manufacturing than to agriculture." 349 U. S., at 265.

The judgments of the Court of Appeals are reversed and those of the District Court affirmed.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT.

The Administrator defined "area of production," as used in § 13 (a)(10) of the Fair Labor Standards Act, as follows (29 CFR, c. V, § 536.2):

(a) An individual shall be regarded as employed in the "area of production" within the meaning of section 13 (a)(10) of the Fair Labor Standards Act in handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, or in making cheese or butter or other dairy products:

(1) If the establishment where he is employed is located in the open country or in a rural community and 95 percent of the commodities on which such operations are performed by the establishment come from normal rural sources of supply located not more than the following air line distances from the establishment:

(i) With respect to the ginning of cotton—10 miles;

(ii) With respect to operations on fresh fruits and vegetables—15 miles;

(iii) With respect to the storing of cotton and any operations on commodities not otherwise specified in this subsection—20 miles;

(iv) With respect to the compressing and compress-warehousing of cotton, and operations on tobacco, grain, soybeans, poultry or eggs—50 miles.

(b) For the purposes of this section:

(1) "open country or rural community" shall not include any city, town or urban place of 2,500 or greater population or any area within:

(i) One air-line mile of any city, town, or urban place with a population of 2,500 up to but not including 50,000 or

(ii) Three air-line miles of any city, town or urban place with a population of 50,000 up to but not including 500,000, or

(iii) Five air-line miles of any city with a population of 500,000 or greater,

according to the latest available United States Census.

(2) The commodities shall be considered to come from "normal rural sources of supply" within the specified distances from the establishment if they are received

(i) from farms within such specified distances, or

(ii) from farm assemblers or other establishments through which the commodity customarily moves, which are within such specified distances and located in the open country or in a rural community, or

(iii) from farm assemblers or other establishments not located in the open country or in a rural community provided it can be demonstrated that the commodities were produced on farms within such specified distances.

(3) The period for determining whether 95 percent of the commodities are received from normal rural sources of supply shall be the last preceding calendar month in which operations were carried on for two workweeks or more, except that until such time as an establishment has operated for such a

calendar month the period shall be the time during which it has been in operation.

(4) The percentage of commodities received from normal rural sources of supply within the specified distances shall be determined by weight, volume or other physical unit of measure, except that dollar value shall be used if different commodities received in the establishment are customarily measured in physical units that are not comparable.