**James P. MITCHELL, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**Harry A. HORNBUCKLE, Defendant.**

**Civ. A. No. 413.**

United States District Court
M. D. Georgia,
Valdosta Division.
June 24, 1957.

**206**

Beverley R. Worrell, Regional Counsel, Sanford Palmer, U. S. Dept. of Labor, Birmingham, Ala., for plaintiff.

Homer C. Eberhardt, Franklin, Eberhardt, Barham & Coleman, Valdosta, Ga., R. R. Forrester, Tifton, Ga., for defendant.

BOOTLE, District Judge.

Suing under Section 17 of the Fair Labor Standards Act, 29 U.S.C.A. § 217, the plaintiff seeks to enjoin the defendant from a repetition of alleged violations of the child labor minimum wage, overtime, record keeping and shipment provisions of the Act.

The scene of the alleged violations is a plant packing shed located in Omega, Georgia, a village with about 1,000 inhabitants, the shed being owned by the defendant's wife, but leased and operated by him. This plant packing shed is a portion of a warehouse owned and maintained by defendant's wife for the storage of cotton. The warehouse has a total area of about 27,000 square feet. The area known and referred to as the plant packing shed consists of a space of approximately 70' X 100', separated from the remainder of the warehouse space by a wire field fence.

The defendant, under the name of Service Plant Company, started growing agricultural plants about 1930. This operation has continuously increased until now he is planting approximately 800 acres to plants in Georgia (600 acres in tomato plants), and from 200 to 250 acres in Florida (all in tomatoes). In addition to tomato plants, he grows some cabbage, pepper, onion and other types, his total annual production being around one hundred million plants, about 60 million of which are tomato plants.

The Florida plants are pulled and sold from the middle of March until about April 20th of each year, and are, for the most part, marketed in Georgia, North Florida, South Carolina and Alabama. These Florida plants are brought by truck to the defendant's packing shed at Omega, Georgia, for packing. The Georgia grown plants are gathered, packed and shipped from about April 25th until June 1st, each year, being grown, for the most part, in the vicinity of Omega, Georgia and marketed in Virginia, Maryland, Pennsylvania, Ohio, Indiana and New Jersey. They are packed in the packing shed at Omega and shipped largely by truck to the places where sold. Some customers send their own trucks to the packing shed for their purchases of plants. Other customers use leased trucks, and occasionally shipments are made in defendant's trucks.

In addition to plant growing, the defendant engages in general farming, growing tobacco, corn, peanuts, cotton and other farm products, devoting some 1,200 acres to this. He owns none of the land on which he grows plants or farms, but leases or rents it all.

Hornbuckle Farms, Inc., was organized about 1940 and received title to all lands then owned by the defendant. The defendant owns 98% of the capital stock in this corporation. His wife owns 1% and the bookkeeper the other 1%. They constitute the Board of Directors and Officers of the company. Ever since its formation it has leased all of its real estate and farm equipment to the defendant. It has no income other than rentals except occasional capital gains from sales of properties. Its rental income has amounted to $20,000 or more each year and has been regularly returned on its income tax returns, the defendant having charged out such rental as business expense on his personal returns. The land is rented on an annual basis, while the trucks, tractors and other farm equipment belonging to the corporation are rented or leased on a monthly rental basis.

In the packing shed are two simply constructed conveyor belts on which plants are placed and carried down a line where employees stand engaged in packing the plants. These employees throw out foreign matters, broken and faulty plants, place peat or sphagnum moss about the roots of the plants and wrap them in paper. The plants are then placed in crates or hampers and labeled for shipment. In the packing shed there are also some chain-like conveyors for moving the filled crates and hampers from the packing line to the trucks on which they are loaded.

It is tomato plants, for the most part, that must thus be packed. Cabbage and some other plants are gathered and put directly into hampers in the field. They are not as perishable as tomato plants and can be shipped without having the protective moss and wrapping.

Plants are subject to various kinds of disease and insect infestation. Accordingly the trade generally demands that plants be certified so that a reasonable freedom from these troubles may be expected. The Department of Entomology of Georgia has a certification program. To qualify for certification of the plants it is necessary that a grower obtain his seed from a source where certification programs are in effect, and to have samples sent to said Department of Entomology where tests are made for bacteria and germination. If standards are met, the seed are approved. Thereafter the grower must have his land inspected and approved by the Department. Freedom from nematodas, grasses and other objectionable matter is required. To accomplish this, the Department must check the history of the use of the land and make certain tests. Actually, as a rule, it is not safe to plant the same land to tomato plants, or other plants, more than three or four years in succession. Accordingly, farmers who grow plants must either own large quantities of land, or must rent land from others. It is highly desirable to obtain "new ground" for planting. This is generally accomplished by an arrangement with the owner of the lands from which the trees have been cut, whereby the plant grower will have the land cleared of stumps, undergrowth, etc., and in consideration of this he will have the use of the land for three or four years. The cost of such land clearing runs from $35 to $55 per acre, depending upon the location, nature of clearing, et cetera.

Help in the fields for pulling the plants is obtained from the farms and from town where it is brought out on trucks. These employees pull at a stated price per 1,000 plants, and are paid at the end of each day. Pulling cannot be started until the dew has dried from the plants, or until rain water has evaporated from them. If pulled while wet the plants will wilt and die before they can be marketed.

As they are pulled they are assembled into packs of 100, each pack being tied with a string, and then placed in burlap bags for protection from the sun. As soon as a truck load has been pulled, it is sent immediately to the packing shed. Generally, it is about noon before plants reach the shed.

Employees at the shed—generally people from nearby farms and from the little town of Omega—number from 50 to 75, depending upon the volume of work. There is a heavy turnover of employees each week. When the plants have been unloaded the strings are cut from packs of 100 each and they are placed on the conveyor belts which take them on to people engaged in packing and wrapping. Most of the employees who pack the plants are women. Many are elderly and could not work out in the sun. Some of the employees are children of school age. During the two year period covered by the testimony in this case a total of 257 different employees were employed and 34 of them were minors. As above stated, only from 50 to 75 were employed at any one time. In perhaps two instances, young boys below school age came with their mothers when they worked at the shed, and the defendant allowed these boys to loosen crates or hampers and paid them small amounts for so doing.

These boys accompanied their mothers because there was no one at home to care for them and because they welcomed the opportunity to earn a little money for themselves.

The children of school age, some girls and some boys, work at the packing of plants. Because of the sporadic nature of the work and its peak periods, the defendant considers it necessary that he employ children in the packing shed. He has given instructions to his key personnel that no child of school age be employed during school hours. These instructions, however have not been effective and there have been several, if not many, instances where school children have worked in the packing shed during school hours. One witness, for instance, Doris Shipman, who became 16 on December 18, 1956, testified that a lot of the school children worked in the packing shed missing an afternoon class, and named four besides herself and stated there could be others and that this had happened from one-half dozen to eleven times during a particular six week period and that she herself had once or twice been absent from school and worked all day. During a peak period of about two weeks in the packing of the Georgia grown plants the packing shed operates frequently past midnight and, occasionally, as late as three o'clock, A.M. During the spring of each year for many years past it has been the policy of the Board of Education in charge of the school at Omega to open school about thirty minutes early and to dismiss about thirty minutes early so that farm children might be available to help at home in getting crops planted, etc. Until spring, school opens at 8:25 A.M., closing at 3:05 P.M., but after the spring holidays the hours are moved up to 7:55 A.M. for opening and 2:35 P.M. for closing. In addition, it has been the policy to permit children who have no classes during the last period of the day to leave 45 minutes earlier, or about 1:50 P.M.

The work was by the hour. If all plants were packed, the employees were released and informed as to when additional plants were expected to arrive. They did not go back on the payroll until more plants came in and work started up again. Sometimes ten minute breaks were allowed with pay.

There is a peak season of about two weeks in the gathering and shipping of Georgia grown plants, occurring about May 10th to May 25th. As above stated, during these peak periods work at the packing shed continues frequently past midnight and, occasionally, as late as 2 or 3 A.M. All employees at the packing shed generally work until it closes, including the children of school age. Naturally, this night work on the part of the school children had its effect on their school work. According to the testimony of the school principal some of the children during this peak period have fallen asleep in the class room and he attributes their drowsiness in part to their work at the packing shed. During the non-peak season the hours are less unreasonable and the packing shed ceases operations somewhere between 10 P.M. and 1 A.M.

All plant growers find it necessary to get the plants to a packing shed and have them packed on the same day they are pulled in order to make a good pack, keep them in condition for replanting, preserve them for market, prevent deterioration and spoilage and loss through heating, etc., and in order to be able to ship them as certified plants.

There is a concentration of plant growers in the area of South Georgia around Tifton, Omega, Moultrie, Adel and Valdosta. All of them follow substantially the same practice and process in the pulling and packing of the plants. Substantially all, if not all, have packing sheds. There is no substantial difference in their operations and those of the defendant, nor any substantial difference in their sheds. Occasionally a plant grower whose land is situated so that he can have access to electricity and water at a point on the highway where loading facilities for large shipping trucks is available, will place his shed on his farm.

Many growers, however, rent space in tobacco warehouses, or in other buildings in town. Occasionally one will build and own his own shed.

In order to get a marketable package of plants (except for the mail order trade) the facilities such as are provided in defendant's packing shed are necessary. The Joseph Campbell Company (connected with Campbell Soup Company) has a packing shed at Tifton and another one at Cairo, Georgia. It contracts with local farmers for growing plants and buys them in the burlap, doing their own grading and packing. The defendant sells them from ten million to fifteen million in that fashion each year, out of his total production of sixty million tomato plants. Campbell offers a limited and restricted market. Under its contracts with the farmers it does not bind itself to purchase, and when it has obtained sufficient plants to meet its needs, it buys no more. There is no other market for quantity sales of plants in burlap, that is to say, unpacked, than Campbell. Campbell pays for plants unpacked from $1.75 to $1.85 per thousand, whereas the packaged plants bring from $3.75 to $4 per thousand. This price differential results from the increased cost to the plant grower in thus preparing his plants for market. In the packing operation there is the cost of the sphagnum or peat moss wrapped around the roots, the cost of the wrapping materials, the cost of crates and hampers, and the cost of labor in grading, wrapping and packing, et cetera.

As a rule, the defendant runs no plants through his shed except those he has grown. When the crop is short, however, he occasionally finds it necessary to buy a relatively small quantity of plants from a fellow grower for use in filling an order from a customer whose business he wants and needs to retain, thus the defendant, in 1955, purchased approximately 600,000 plants from the Hendersons near Waycross, Georgia and approximately 600,000 plants from Sims in Florida. The plaintiff contends that the latter figure should be nearer 1,000,000 plants, but its contention is based upon a totaling of certificates issued in Florida on behalf of the Department of Entomology, which certificates were issued in advance, good for four days, and based upon estimated pullings, whereas the figure of 600,000 is based upon the defendant's testimony from his records. Thus the defendant's total purchases during 1955, 1,200,000 is a little more than one per cent of his total volume of 100,000,000 plants grown and sold each year, and is two per cent of the volume of his tomato plants grown and sold. Such emergency purchases by the defendant are usually at a higher price than he receives from his customer.

About 1948, the defendant suffered financial reverses. He had organized several companies operating in fields not familiar to him and endorsed their obligations. He was personally responsible for approximately $271,000 of their unpaid debts and judgments were obtained against him on these items for approximately $100,000. Hornbuckle Farms, Inc. held title to the real estate and could borrow money. It borrowed in excess of $100,000 on the lands and made that available to the defendant through its bank account. Checks of the corporation were issued to make payment on his behalf for seed, fertilizers, insecticides, materials of various kinds and for the payment of labor. All of the advances were charged to the defendant on the corporation's books, and after the crops were gathered and sold, including the plants, the proceeds were deposited into the corporation's bank account and the defendant was credited therewith on its books and records. The books of the defendant show that all money advanced to or for him by the corporation was credited to it and that he repaid it by depositing the proceeds from the sale of farm produce, including plants, into the corporation's bank account. The corporation's books and records show the same. The bookkeeping of the corporation and of the defendant was accurate and in detail.

All invoices for seeds, fertilizers, crate materials, etc., were to the defendant, or to Service Plant Company, his trade name. None was to Hornbuckle Farms, Inc. These items were sold to the defendant, not to the corporation. All plants were grown and sold by the defendant in his trade name, Service Plant Company. All bills, including those for labor and payments for certifications of plants, were paid by the defendant using the checks and bank account of the corporation as an expediency. The corporation never operated any farm, nor grew, packed or sold any plants.

The defendant shipped in commerce plants packed at this shed in which, within thirty days prior to the removal of such plants therefrom, oppressive child labor, as defined in the Act, had been employed.

Sometimes the defendant goes himself, and sometimes sends his son-in-law and a few other employees into the market territory in the fall to obtain orders for plants so he will know how many to grow. When the plants are ready for pulling, packing and shipping some of these men return to the market territory to assist with sales, handle complaints and to collect.

The defendant makes no effort to comply with the minimum wage or overtime provisions of the Act, claiming the exemption provided by Section 13(a) (6) of the Act, 29 U.S.C.A. § 213(a) (6).

The facts being as above found and stated, the case presents two questions: whether the defendant's employees are engaged in agriculture, and whether there are such child labor violations as to require an injunction against repetition thereof.

Section 13(a) (6) says: "The provisions of sections 6 (minimum wages) and 7 (maximum hours) shall not apply with respect to * * * (6) any employee employed in agriculture * * *." And Section 3 (f), 29 U.S.C.A. § 203(f), says: " 'Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage of the soil * * * the production, cultivation, growing and harvesting of any agricultural or horticultural commodities * * * and any practices * * * performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery * * * to market or to carriers for transportation to market."

It seems plain to this Court that all of the defendant's employees are employed in agriculture. The plaintiff makes no contention as to those in the field planting, growing and pulling the plants. This attack is as to those employees working in the packing shed and as to the few who sell. This agricultural exemption was meant to embrace the whole field of agriculture, and Congress took pains to spell it out in detail. Maneja v. Waialua Agricultural Co., 349 U.S. 254, 260, 75 S.Ct. 719, 99 L.Ed. 1040. The Supreme Court in the case of Farmers Reservoir and Irrigation Co. v. McComb, 337 U.S. 755, 69 S.Ct. 1274, 93 L.Ed. 1672, speaks of the "primary meaning" and the "broader meaning" of agriculture. These packing shed employees, if not engaged in agriculture or farming in the "primary meaning", are certainly engaged in agriculture and farming in the "broader meaning." In the words of the statutory definition, they are engaged in "harvesting of * * * agricultural commodities * * * and (in) practices * * * performed by a farmer * * * as an incident to or in conjunction with such farming operations, including preparation for market, delivery * * * to market or to carriers for transportation to market." They are "harvesting" agricultural commodities. Everything done to the plants at the packing shed is necessary in order that they may be sold. While a few plants can be sold to the mail order trade, and a small percentage to the Campbell Company in the raw, or in burlap, there is no relatively sizeable market for these plants except when they are cleaned, graded, packaged and wrapped at the packing

shed. Moreover, the packing shed operation does not change the physical properties or chemical content of the product as was done to the tobacco in the case of Mitchell v. Budd, 350 U.S. 473, 475, 76 S.Ct. 527, 100 L.Ed. 565. In fact, this packing shed operation for these tomato plants is more analogous to the tobacco barn operation described in the Budd case than to the bulking plant processing described therein. The Government did not raise any question as to the tobacco barn employees being engaged in agriculture. Nor does this packing shed operation transform the product as was done by the sugar processing plant in the case of Maneja v. Waialua Agricultural Co., supra. The work at this packing shed is designed to preserve the plants "as is" so that they can be transplanted in other climes and there resume their growing process.

The plaintiff's suggestion that perhaps the farmer in this case is the corporation rather than the defendant must be rejected. The corporation was a financing medium serving as a bank account for the defendant, and the defendant was the farmer. Since these practices were performed by a farmer, they, of course, did not have to be performed on the farm and the fact that the packing shed is in the town of Omega does not matter. Certainly, these activities are incident to and in conjunction with the defendant's farming operations and following the statutory definition further they constitute "preparation for market (and) delivery to market or to carriers for transportation to market."

The presence of a few conveyor belts in the packing shed does not defeat the exemption. The Act does not distinguish between large or small farms, nor between mechanized or non-mechanized agriculture. If a "main line railroad" and its repair shops can be regarded as a farm implement (Maneja v. Waialua Agricultural Co., supra) these simple conveyor belts and chains present no problem. Likewise, the fact that the defendant purchased rather than grew about

two per cent of his volume in order to round out his sales, such purchases being necessitated by crop failures and other emergencies, does not defeat the exemption. Walling v. Rocklin, 8 Cir., 132 F.2d 3(4).

The activities of defendant's sales representatives are exempt as a practice performed by a farmer as an incident to and in conjunction with his farming operations. The Administrator's Interpretive Bulletin 780, Section 780.20(g) so reads: "* * * provided it (the selling) does not amount to a separate enterprise." No separate enterprise exists here.

It follows, therefore, that the defendant's packing shed employees and sales employees are exempt as claimed by the defendant.

On the child labor issue, however, the defendant does not fare so well. Section 3(l) of the Act, with exceptions not here material, says: " 'Oppressive child labor' means a condition of employment under which (1) any employee under the age of sixteen years is employed by an employer * * * in any occupation * * *." Section 12(a) 29 U.S. C.A. § 212(a), says: "No producer, manufacturer, or dealer shall ship or deliver for shipment in commerce any goods produced in an establishment situated in the United States in or about which within thirty days prior to the removal of such goods therefrom any oppressive child labor has been employed: * * *." As stated above, the defendant did ship in commerce plants packed at his packing shed in or about which within thirty days prior to the removal of such plants therefrom oppressive child labor, as defined by the Act, that is to say, children under sixteen years of age, had been employed. At this point, the defendant turns to Section 13(c) and seeks protection thereunder, but this latter section reads as follows: "The provisions of section 12 relating to child labor shall not apply with respect to any employee employed in agriculture outside of school hours for the school dis-

trict where such employee is living while he is so employed * * *." The trouble is that more than a negligible number of these children under sixteen years of age were employed by the defendant on more than a negligible number of occasions not "outside of school hours", but during school hours. As is above pointed out, during the non-peak season the packing shed closes down usually between 10 P.M. and 1 A.M., and during the peak season of about two weeks it sometimes remains in operation as late as 2 or 3 A.M. Speaking of these hours, defendant's counsel, in their brief, says:

"Admittedly this is later than it is good for school children to work. It makes them sleepy and sluggish the following day. But there is no prohibition in the law or in any regulation issued pursuant thereto which prevents the employment of child labor in agriculture during those hours. Working at night is not working 'during school hours'. No school is in session at that time. The good feature is that this lasts for only a very short time. The work is altogether seasonal, and the season is short.

"While it may not be good for the children to work those late hours, yet it is not a violation of any law. It is not prohibited by law."

With reference to the legal aspects of this night work counsel are correct. This Court cannot prohibit or even regulate it. This matter as the law now reads must be left to the children, their parents and the defendant. The law does, however, prohibit the employment of these children under sixteen years of age during school hours and this practice of night employment makes it all the more important that the law be strictly observed as far as it goes. The beneficent purpose of the child labor provisions of the Act, when viewed in the light of the facts of this case, would seem fully to justify, if not to require, the issuance of a permanent injunction enjoining the defendant from employing any child, or children, under the age of sixteen years during school hours.

Let counsel for the defendant prepare a final decree in accordance herewith, each party to bear his own costs, and submit same to counsel for the plaintiff who shall have five days for suggestions as to form.