The **BORDEN COMPANY**, a New Jersey corporation, Plaintiff,

v.

Orville L. **FREEMAN**, Secretary of Agriculture, United States of America, S. R. Smith, Administrator, Agricultural Marketing Services, Department of Agriculture, United States of America, and G. R. Grange, Deputy Administrator, Agricultural Marketing Services, Department of Agriculture, United States of America, Defendants,

and

Campbell Soup Company, a New Jersey corporation, Intervenor-defendant.

Civ. No. 865–64.

United States District Court
D. New Jersey.

June 10, 1966.

594

Pitney, Hardin & Kipp, Newark, N. J., William P. Reiss, Newark, N. J., Sonnenschein, Levinson, Carlin, Nath & Rosenthal, Chicago, Ill., Earl E. Pollock, Chicago, Ill., for plaintiff.

David M. Satz, Jr., U. S. Atty., Mark E. Litowitz, Asst. U. S. Atty., Trenton, N. J., and Irwin Goldbloom, Attorney, Department of Justice, Washington, D. C., for defendants.

Richman, Berry & Ferren, Camden, N. J., Grover C. Richman, Jr., Camden, N. J., Covington & Burling, Washington, D. C., Paul C. Warnke, Washington, D. C., for intervenor-defendant.

## OPINION

LANE, District Judge.

On September 21, 1964, The Borden Company filed a complaint in this court contesting the validity of certain amended regulations promulgated by defendant, the Secretary of Agriculture of the United States, pursuant to regulatory powers granted him under the Poultry Products Inspection Act,[1] hereinafter referred to as the Poultry Act. The regulations scheduled to be effective as of January 1, 1965, would have prohibited plaintiff's subsidiary, Wyler and Company, from continued sale of "Wyler's Chicken Noodle Soup Mix" and "Wyler's Chicken Rice Soup Mix" as labeled and formulated prior to that date.[2]

Plaintiff's soup mixes involved here are dehydrated food products sold throughout the United States in foil envelopes. The Wyler chicken noodle soup mix has been sold for over 25 years and contains powdered chicken meat in an amount greater than 2% of the weight of

1. 21 U.S.C. § 451 et seq. (1964).

2. 7 C.F.R. §§ 81.134 and 81.208 (Supp. 1965).

the package, but less than 2% of the volume of the soup in its ready-to-serve state. The Wyler chicken rice soup has been sold for over 15 years, and contains the same proportion of powdered chicken. Since their introduction into the market, these soups have borne the same labels and been produced pursuant to substantially the same formulae as at present.

The regulations as amended (§§ 81.134 and 81.208) are the latest product of nearly continuous efforts by the Secretary of Agriculture since the passage of the Poultry Act in 1957 to resolve a dilemma. The Secretary has sought to remove from his jurisdiction certain products which contain so little poultry that to regulate them constitutes an unnecessary burden on the Department of Agriculture and a waste of its expertise. By promulgating the predecessors of §§ 81.134 and 81.208, the Secretary had exempted from the operation of the Poultry Act all soup products with less than 2% poultry content.

Under that prior regulatory scheme, such products as dehydrated soups containing less than 2% poultry meat bore the label "Chicken Soup" or other indication of substantial poultry meat content. Having divested himself of jurisdiction over such products, the Secretary of Agriculture was powerless to insure that their labels were not false and misleading. Also, soup manufacturers such as Campbell Soup Company, whose products contain more than 2% poultry meat and are necessarily more expensive to purchase, were complaining that their soups alone should be entitled to bear the unqualified "Kind" label, "Chicken Soup."

Early in 1964, the Secretary initiated steps calculated to effect more acceptable exemption provisions. Informal hearings were held in Washington, D. C., on March 23–25, 1964. Some interested parties, including plaintiff and other soup producers, expressed their views at these hearings. Others supplied written information or expressed their opinions by letter. On June 1, 1964, the amended regulations were issued. They read, where pertinent, as follows:

§ 81.134  *Product specifications for labeling purposes.*

(a) *Authorization to establish specifications.* The Administrator is authorized to establish specifications covering the principal constituents of any poultry food product with respect to which a specified name of the product or other labeling terminology may be used, whenever such action is necessary to prevent sale of the product under a false or deceptive name or other false or misleading labeling. The requirements of this section are hereby found to be necessary for this purpose.

\* \* \* \* \* \*

(6) *Other poultry dishes and specialty items.* (i) \* \* \* Products \* \* \* having less than the specified minimum poultry meat content, may use the "Kind" name in the product name, provided it is appropriately qualified to distinguish such products from those containing the specified minimum meat content.

(ii) Products of the types specified in § 81.208(a) and (b) will be deemed to have false, deceptive or misleading labeling if they use the "Kind" name of the poultry (chicken, turkey, etc.) in the product name without appropriate qualification. For example, a consumer packaged noodle soup product containing less than 2 per cent chicken meat on a ready-to-serve basis may not be labeled as "Chicken Noodle Soup" but, when appropriate, could be labeled as "Chicken Flavored Noodle Soup."

\* \* \* \* \* \*

§ 81.208  *Exemption from definition of "poultry product" of certain human food products containing poultry.*

Section 4(e) of the Poultry Products Inspection Act (21 U.S.C. 453(e)) defines the term "poultry product" to include any human food product consisting of any edible part of poultry separately or in combination with other ingredients, unless such human food product is exempted by the Secretary from such definition. It has been de-

termined that the effectuation of the purposes of the Act does not require the full application of the requirements of the Act and the regulations to the following human food products which consist in part of edible parts of poultry. * * * Therefore, the Poultry Products Inspection Act and the regulations thereunder shall be applicable to the following products only to the extent of requiring that they comply, in the judgment of the Secretary, with the conditions specified below and said products, if they so comply with such conditions, are exempted from the definition of "poultry product" and the application of said Act and the regulations:

(a) Any human food product (in a consumer package) not provided for in paragraph (c) of this section, if: (1) It contains less than 2 per cent cooked poultry meat (deboned white or dark poultry meat, or both); * * * and (5) the product does not in any respect have a false or misleading label. (See § 81.134 with respect to labeling.) The aforesaid percentages of ingredients shall be computed on the basis of the moist, deboned, cooked poultry in the ready-to-serve product when prepared according to the serving directions on the consumer package.

Plaintiff, following the publication of these regulations, brought action in this court; and after hearing, defendant was preliminarily enjoined from enforcing the regulations, pending judicial review of the administrative proceedings. Upon due application to this court, Campbell Soup Company, on September 30, 1965, was granted leave under F.R.Civ.P. 24(b) to intervene as a party defendant.

This court will consider not only the question of the evidentiary support for the contested rulings, but also several critical jurisdictional and procedural issues raised by plaintiff.

Plaintiff Borden alleges first that there is not statutory authority for the promulgation of such general, quasi-legislative standards of identity for poultry products as are set forth in § 81.134. Plaintiff also contends that the Secretary may not condition a product's exemption from the operation of the governing act upon the type of label used, as is done in § 81.208.

The relevant statutory provisions in the Poultry Act are as follows:
21 U.S.C. § 453. *Definitions*

For purposes of this chapter—

\* \* \* \* \* \*

(e) The term "poultry product" means any poultry which has been slaughtered for human food * * * in accordance with rules and regulations promulgated by the Secretary, any edible part of poultry, or, unless exempted by the Secretary, any human food product consisting of any edible part of poultry separately or in combination with other ingredients.

§ 457. *Labeling* * * *

\* \* \* \* \* \*

(b) The use of any written, printed or graphic matter upon or accompanying any poultry product inspected or required to be inspected pursuant to the provisions of this chapter or the container thereof which is false or misleading in any particular is prohibited. No poultry products inspected or required to be inspected pursuant to the provisions of this chapter shall be sold or offered for sale by any person, firm, or corporation under any false or deceptive name; but established trade name or names which are usual to such products and which are not false and deceptive and which shall be approved by the Secretary are permitted. \* \* \* 3

\* \* \* \* \* \*

(d) Using in commerce, or in a designated major consuming area, a false

---

3. Section 457 goes on to outline specific procedures for a case by case, quasi-adjudicative determination by the Secretary of the existence of misleading labels, with specific provisions for appeal by an aggrieved party to the United States Court of Appeals.

or misleading label on any poultry product.

### § 463. *Rules and Regulations*

The Secretary shall promulgate such rules and regulations as are necessary to carry out the provisions of this chapter.

### § 467. *Jurisdiction and powers of Secretary*

(a) For the purpose of preventing and eliminating burdens on commerce in poultry and poultry products, the jurisdiction of the Secretary within the scope of this chapter shall be exclusive and poultry and poultry products shall be exempt from the provisions of the Federal Food, Drug, and Cosmetic Act, as amended, to the extent of the application or the extension thereto of the provisions of this chapter.

### *Jurisdiction of the Secretary of Agriculture*

In pressing its initial jurisdictional attack, plaintiff asks this court to compare the powers of the Secretary of Agriculture under the Poultry Act with those of the Food and Drug Administration under the Food, Drug and Cosmetic Act.[4] Plaintiff asserts that the latter statutes empower the F.D.A. to promulgate regulations establishing general "standards of identity"[5] for products under its jurisdiction, whereas the Poultry Act confers no such authority upon the Secretary of Agriculture. Plaintiff further contends that regulation § 81.134 is in fact such a general standard of identity because it purports to establish requirements which are not based on evidence of a "false, deceptive or misleading" label in a particular case. Without such particular evidence of consumer deception, plaintiff states, the regulation is a general standard such as the Secretary of Agriculture is not authorized to promulgate. In the present case, plaintiff continues, there are no record proofs that the labels on the Wyler's soups, or any others, affected by the regulations are "false, deceptive or misleading." Therefore, plaintiff concludes, defendant Secretary of Agriculture has unlawfully promulgated a general standard of identity without regard to the requisite determination that the labels in issue are in fact false, deceptive and misleading.

All defendants assert that the Secretary of Agriculture does have the power to establish standards of identity by regulation. In support of this argument, the case of Houston v. St. Louis Independent Packing Co., 249 U.S. 479, 39 S.Ct. 332, 63 L.Ed. 717 (1918) is cited. That case involved the authority of the Secretary of Agriculture under the Meat Inspection Act to promulgate the following standards of identity for sausages:

"Sausage shall not contain cereal in excess of two per cent; when cereal is added its presence shall be stated on the label or on the product.

"Water or ice shall not be added to sausage, except for the purpose of facilitating grinding, chopping and mixing, in which case the added water or ice shall not exceed three per cent. * * *" Id. at 480, 39 S.Ct. at 333.

These regulations considered in *Houston* were effected "[f]or the purpose of preventing the use in interstate or foreign commerce of meat or meat food products under any false or deceptive name * * *." Ibid. The applicable enabling provisions in the Meat Inspection Act were:

" 'No such meat or meat food products shall be sold or offered for sale by any person, firm, or corporation in interstate or foreign commerce under any false or deceptive name; but established trade-name or names which are usual to such products and which are not false and deceptive and which shall be approved by the Secretary of Agriculture are permitted.' and that 'said Secretary of Agriculture shall, from time to time make such rules and regulations as are necessary for the efficient execution of the provisions of this act, and all inspections and exam-

---

4. 21 U.S.C. § 301 et seq. (1964).

5. 21 U.S.C. § 371(d) (1964).

inations made under this act shall be such and made in such manner as described in the rules and regulations prescribed by the Secretary of Agriculture not inconsistent with the provisions of this act.' " Id. at 481, 39 S.Ct. at 333 (emphasis supplied by that court).

The Supreme Court referred to the powers of the Secretary of Agriculture, stating:

"Whether or not the term 'sausage,' when applied to the product of the appellee, in which more than the permitted amount of cereal and water is used, is false and deceptive is a question of fact, the determination of which is committed to the decision of the Secretary of Agriculture by the authority given him to make rules and regulations for giving effect to the act * * *." Id. at 484, 39 S.Ct. at 334.

■ The similarity between §§ 457(b) and 463 of the Poultry Act and the statutory grants of power cited in the *Houston* case is obvious. This court notes that the Meat Inspection Act does not (nor did it in 1918) contain the "standards of identity" clause which plaintiff says is necessary to empower an administrative agency to promulgate general regulations. Nevertheless, in the *Houston* case, provisions of the Meat Inspection Act nearly identical to those of the Poultry Act were held to empower the Secretary of Agriculture to establish general regulations controlling the cereal and water content of products labeled "Sausage." Therefore, it follows that the Poultry Act contains a similar grant of authority to the Secretary concerning poultry products employing the "Kind" label.

■ Plaintiff argues that the hearing and review provisions of § 457(b) of the Poultry Act (see footnote 3, supra) limit the Secretary of Agriculture to a case by case adjudicative procedure when dealing with potentially false or misleading labels. There is no doubt that those provisions do outline such a procedure. The secretary, however, is not limited to that procedure alone. He is given additional powers. Sentence one of § 457(b) expressly prohibits false and misleading labeling, as does § 458(d). Section 463 expressly grants to the Secretary the power "to promulgate such rules and regulations as are necessary to carry out the provisions of this chapter." Therefore, the Secretary has a general legislative power concerning matters covered by the Poultry Act *in addition* to whatever adjudicative power is conferred by particular provisions thereof.[6]

■ Since the Secretary of Agriculture may promulgate general regulations that indicate the circumstances under which the "Kind" label is deemed to be deceptive, the regulation in question (§ 81.134) is valid, and plaintiff's initial attack on the jurisdiction of the Secretary must fail.

In contesting regulation § 81.208, plaintiff contends the Secretary has exceeded his statutory power by exempting a less than 2% poultry meat product, and at the same time retaining the right to review and act upon the labeling used on such exempt product. The source of the Secretary's power to exempt certain foods from consideration as "poultry products" is § 453(e), and plaintiff's soups are poultry products as defined in said section unless and until the Secretary acts to exempt them. The enabling statute has been drawn with a view to relieving the Secretary of the unduly burdensome task of supervising the manufacture and sale of products that have little poultry meat, i. e. under 2%. Indeed, this is the primary reason for exemption of a product and was the sole requirement of § 81.208 before the promulgation of the amendment here under attack. If plaintiff's reasoning is accepted, the 2% provision exempting his product is the sole portion of the regulation that has been

---

6. This court notes that § 457(b) nowhere states that it is the exclusive mode of operation for the Secretary in the labeling field; nor has any case so construing that statute come to our attention.

properly enacted, and the remaining portion pertaining to the Secretary's right to regulate the labels of such product would be null and void. If this is so, it necessarily follows that because the enabling statute directs that exempt poultry products are to be administered under the Food, Drug and Cosmetic Act, any supervision of the labeling used on such exempt products would be the business of the Food and Drug Administration.

The Poultry Act contains no requirement that the Secretary consider a product for exemption on the sole basis that its meat content is minimal. There is no indication that Congress intended to so limit the Secretary's powers of exemption. Indeed, such a limitation might well effect one of two equally undesirable results: (1) the Secretary might find it necessary to refrain from exempting any products, however small the chicken meat content, in order to prevent the possibility of false, deceptive labeling; (2) the Secretary might be forced to exempt products solely on the basis of their low chicken meat content. In the first instance, the undue burdens of administration and the wasted expertise would be present. If the second alternative were chosen, producers of exempt soup products would be entitled to employ the "Kind" label despite the lack of a reasonable level of meat content. Such use of the "Kind" label would constitute a threat to unsuspecting consumers, and would be unduly prejudicial to producers who place on the market the more expensive products, with meat content sufficient to justify use of the "Kind" label.

It is not an answer to this problem to argue that the Food and Drug Administration could or would remedy the attendant difficulties. Prior to the promulgation of the amendment to § 81.208, use of the "Kind" label on exempted soups of slight meat content was not controlled. Indeed, this undesirable situation was the very reason for amending that regulation.

Section 81.208 presently exempts from the definition of poultry product all soups with less than 2% chicken meat content which are not sold under a false or misleading label. The "Kind" label on a less-than-2% product is deemed misleading. All other soups containing "any edible part of poultry separately or in combination with other ingredients" [7] *remain* poultry products. By providing for the exemption in this way, the Secretary makes certain that he retains jurisdiction over all deceptively labeled products containing edible poultry. He is thus able to deal effectively with such labeling pursuant to the Poultry Act's mandate. At the same time, non-deceptive products of minimal meat content no longer burden him or his staff.

The administrative duty of establishing a standard of exemption from a defined term such as "poultry product" is analogous to establishing the limits of an "area of production" in accordance with legislative direction. A study of cases involving definitions of statutory terms indicates that an administrative official "fulfills his role when he makes a reasoned definition." Mitchell v. Budd, 350 U.S. 473, 480, 76 S.Ct. 527, 531, 100 L.Ed. 565 (1956). *Mitchell* involved a definition of the term "area of production" as used in the Fair Labor Standards Act.[8] In summarizing the definition promulgated, the Supreme Court observed:

"The Administrator's definition of 'area of production' provides that a plant is within the 'area of production' if it is located (1) 'in the open country or in a rural community', which is defined as not including 'any city, town or urban place of 2,500 or greater population', and (2) within a specified mileage distance from the source of 95% of its commodities." Id. at 476, 76 S.Ct. at 530.

The United States Court of Appeals for the Fifth Circuit, 221 F.2d 406, had declared this definition invalid on the grounds that "area" contemplated mile-

---

7. 21 U.S.C. § 453(e) (1964).

8. 29 U.S.C. § 201 et seq. (1964).

age boundaries only and did not provide for "any qualification by reason of size of the town where the establishment is located." Id. at 477, 76 S.Ct. at 530. The Supreme Court reversed on the grounds that Congress intended that a line be drawn "between agricultural enterprises operating under rural-agricultural conditions and those subject to urban-industrial conditions." Id. at 478, 76 S.Ct. at 530. In this context, therefore, the Administrator could phrase his definition of the term "area of production" in such a way as would serve the Congressional intent. The Court concluded:

> "No definition of 'area of production' could produce complete equality, for the variables are too numerous. The Administrator fulfills his role when he makes a reasoned definition. See Gray v. Powell, 314 U.S. 402, 411, 62 S.Ct. 326, 332, 86 L.Ed. 301. On no phase of this problem can we say that the Administrator proceeded capriciously or by the use of inadmissible standards. Experts might disagree over the desirability of one formula rather than another. It is enough for us that the expert stayed within the allowable limits." Id. at 480, 76 S.Ct. at 531.

The *Gray* case cited above involved a determination by the Director of the Bituminous Coal Division of the Department of the Interior that the Seaboard Air Line Railway Company was not a "producer" of coal. The function of making such a determination had been specifically delegated to the Director by Congress. The Court held Congress had vested in the Director the power to make "a sensible exercise of judgment" in reaching his decision, and that the Director had done so. Gray v. Powell, 314 U.S. 402, 413, 62 S.Ct. 326 (1941).

■ The facts of the case at bar clearly indicate that § 81.208 of the Secretary of Agriculture's regulations is "a reasoned definition" of what products are to be considered exempt from the term "poultry product." This regulation is "a sensible exercise of judgment" by the Secretary; for it provides for the best possible workable compromise between the policies of (1) insuring against the use of false or misleading labels and (2) allowing the Secretary to divest himself of jurisdiction over products whose poultry content is minimal.

For the reasons outlined above, this court concludes that the Secretary of Agriculture does have the authority to promulgate the plan of exemption set out in § 81.208. Therefore, plaintiff's second jurisdictional attack falls.

*Scope of Review*

There are enumerated in § 10(e) of the Administrative Procedure Act [5 U.S.C. § 1009(e)] the powers and duties of a court called upon to review governmental agency actions:

> "(e) So far as necessary to decision and where presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action. It shall (A) compel agency action unlawfully withheld or unreasonably delayed; and (B) hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; (5) unsupported by substantial evidence in any case subject to the requirements of sections 1006 and 1007 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or (6) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account

shall be taken of the rule of prejudicial error."

█ Plaintiff urges that the "substantial evidence" test of § 10(e) (B) (5) of the Procedure Act is the scope of review appropriate for the present case. That requirement, however, is applicable only to "any case subject to the requirements of sections 1006 and 1007 of this title or otherwise reviewed on the record of an agency hearing provided by statute." Ibid. Sections 1006 and 1007 of Title 5 primarily concern adjudicative hearings and decisions by an agency, and are applicable in quasi-legislative rule-making cases only "[w]here rules are required by statute to be made on the record after opportunity for an agency hearing * * *." [9] The Poultry Act does not require such an agency hearing as is contemplated by either § 10(e) (B) (5) or § 4(b) of the Procedure Act when the Secretary of Agriculture is exercising his rule-making power to exempt certain foods from the classification "poultry product." [10] When no such formal hearing is required, a federal agency which is in the process of making a rule or regulation need only follow the notice and informal hearing requirements of §§ 4(a) and 4(b) of the Procedure Act [5 U.S.C. § 1003(a), (b)], which are:

(a) *Notice.*—General notice of proposed rule making shall be published in the Federal Register * * * and shall include (1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved. * * *

(b) *Procedures.*—After notice required by this section, the agency shall afford interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity to present the same orally in any manner; and, after consideration of all relevant matter presented, the agency shall incorporate in any rules adopted a concise general statement of their basis and purpose. * * * *[11]

█ Since neither §§ 1006 and 1007 of Title 5 nor any provisions of the Poultry Act require a formal "agency hearing" in the case at bar, this court concludes that Congress did not intend that the "substantial evidence" test of § 10(e) (B) (5) of the Procedure Act be applied to the record here.

█ Plaintiff argues alternatively that if no formal hearing at the agency level is required, a reviewing court must conduct a trial de novo as to relevant facts, pursuant to § 10(e) (B) (6) of the Procedure Act. Despite the expressions of policy in the House Committee report alluded to by plaintiff,[12] this court holds, as have others, that where an agency properly exercises its rule-making function, and during the course thereof compiles a substantial record by means of documents and oral testimony, a trial de novo on the facts which were the basis for the rules adopted is not available to one contesting their validity.[13] To hold otherwise would be to force many agencies to hold time-consuming formal hearings, although the statutes empowering those agencies require no such hearings. Thus the public policy behind delegating to agencies such rule-making power as would otherwise lie in Congress alone,

---

9. Administrative Procedure Act § 4(b), 5 U.S.C. § 1003(b) (1964).

10. Cf. Sterling Davis Dairy v. Freeman, 253 F.Supp. 80 (D.C.N.J.1965, opinion filed October 7, 1965), where this court applied the substantial evidence test in reviewing a formal agency hearing specifically provided for in the Agriculture Marketing Agreement Act of 1937. 7 U.S.C. § 601 et seq.

11. In the case at bar, the Secretary complied with §§ 4(a) and 4(b) by giving timely notice of and subsequently holding the informal hearing of March 23–25, 1964.

12. See page 53 of plaintiff's memorandum on the evidence.

13. Noren v. Beck, 199 F.Supp. 708 (S.D. Cal.1961).

**602**

i. e. speed and efficiency, would be thwarted. The Poultry Act does not require a trial de novo of facts relevant to the Secretary of Agriculture's exercise of his "exemption" powers under § 453(e) thereof. Nor is the court presented with an administrative "adjudication" such as might be "subject to a subsequent trial of the law and the facts de novo in any court." [14]

■ Having determined that neither the substantial evidence test of § 10(e)(B)(5) nor a trial de novo under § 10(e)(B)(6) of the Procedure Act is appropriate for the present case, this court concludes that its scope of review is limited to a determination of whether the promulgation by the Secretary of regulations §§ 81.134 and 81.208 was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law".[15]

### The Record

■ Should it be found that the evidence in the record supporting the adoption of the regulations as promulgated is sufficient to refute the contention that the Secretary acted arbitrarily, capriciously, or in abuse of his discretion, the regulations are to be declared valid. In reviewing the record, it is, of course, not the province of the court to substitute its judgment for that of the administrative agency properly authorized by Congress to exercise rule-making functions in areas where that agency possesses a unique expertise.

The evidence which the Secretary himself thought was particularly persuasive is discussed in a Statement of Considerations published in the Federal Register of July 7, 1964. The Secretary alluded to the following: (1) soup formulae on file with the U.S.D.A., (2) "written comments received," (3) "data * * * submitted at the oral hearing on March 23–25, 1964." Referring to categories (2) and (3), he stated:

"These comments and testimony came from customers or consumer oriented groups, representatives of the poultry industry and poultry associations, soup manufacturers, and other interested persons."

The oral testimony included that of Dr. Cliff D. Carpenter, a consultant to the poultry industry who testified that the preservation of the confidence of consumers required a standard of minimum poultry meat content in poultry products. He cited examples where unchecked diminishing of the meat content of chicken pies had deceived consumers and thus produced a reaction which effected a sharp drop in consumption. Also, Arnold Mayer, Legislative Representative of the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO, said that a consumer had the right to expect at least 2% meat, measured on a ready-to-serve basis, in soups bearing the unqualified kind label. Further, several executives of major soup companies [15] testified in favor of the regulations as finally promulgated, as did H. P. Schmitt, research director for the National Association of Frozen Food Packers.

Written comments included a letter from Mrs. Esther Peterson, the Special Assistant to the President for Consumer Affairs, dated April 15, 1964, stating:

"Since the label on a product is the consumer's primary guide in making a wise decision, it must be meaningful. Products which differ substantially in poultry content should not bear the same or similar labeling terminology. The establishment of minimum standards for labeling purposes is in accordance with one of the important rights of consumers as set forth by the President—the right to be informed."

14. Administrative Procedure Act § 5, 5 U.S.C. § 1004 (1964).

15. Administrative Procedure Act § 10 (e) (B) (1), 5 U.S.C. § 1009(e) (B) (1) (1964).

15. Andrew Paretti, president and general manager of Bon Vivant Soups, Inc.; Carl Hinshaw of Chalet Suzanne Foods, Inc.; Donald W. Leeper of H. J. Heinz Company; and Donald M. Mounce, a vice-president of Campbell Soup Company.

Mrs. Peterson also contended that since the ready-to-serve stage was of primary importance to the consumer, all minimum content standards should relate to that stage regardless of the form of packaging. Another letter which appears is that of New York University professor Dr. Irene Oppenheim of the Department of Home Economics, who, on April 6, 1964, wrote to Mr. Kilpatrick of the Department of Agriculture that "intelligent consumer choice" in this day of multiple soup products demanded minimum content standards measured on a ready-to-serve basis. Senators, Congressmen, and home economics associations also submitted written statements.

We are dealing with a regulation that requires computing the percentage of the poultry ingredients on the basis of the cooked ready-to-serve product prepared according to the serving directions on the consumer package. The statistical evidence relied upon by the Secretary established that more than 90% of all poultry soups placed on the market meet this test, i. e. they contain more than 2% poultry meat when served. Therefore, it is clear that the Secretary's choice of that figure as the acceptable minimum meets the test of reasonableness.

In the Statement of Considerations, the Secretary specifically referred to the most telling evidence against the regulations adopted. He noted that although many home cookbook recipes do not call for chunks of chicken meat, many others do, and that in any case these recipes are not necessarily "a useful guide in establishing standards for similar commercially prepared products." He resolved an ambiguity concerning the name given to a less-than-2% soup by the United States Army by determining that the approved title is "Soup, Dehydrated, Chicken Flavored." He discounted the relevancy of surveys and polls conducted at plaintiff Borden's request and observed that the findings therein are susceptible to interpretations which would indicate consumer deception with a less-than-2% product bearing the unqualified "Kind" name. Finally, the Secretary

recognized the many years of consumer acceptance of such soups, but concluded that acceptance of a product "does not necessarily mean that it does not have misleading labeling."

The Statement of Considerations, a candid report by the Secretary of his analysis and findings, clearly indicates that the Secretary objectively weighed all the evidentiary material brought to his attention, and took into account the interests of the various contributors. We find that the record contains evidence sufficient to support the amended regulations against the attack that they are arbitrary, capricious, beyond the scope of the Secretary's discretion or otherwise unlawful. Indeed, this court is satisfied that even if the evidential standard of "substantial evidence" were to be applied to the record herein reviewed, the proofs would be sufficient to meet such a test.

Defendants are to submit a form of judgment.