**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Edward P. TEPPER d/b/a Shoenberg Farms, Respondent.**

**No. 6689.**

United States Court of Appeals Tenth Circuit.

Nov. 30, 1961.

Warren M. Davison, Washington, D. C. (Stuart Rothman, Dominick L. Manoli, Marcel Mallet-Prevost and Elizabeth W. Weston, Washington, D. C., on the brief), for petitioner.

Ronald I. Zall, Denver, Colo. (Max P. Zall, Denver, Colo., on the brief), for respondent.

Before MURRAH, Chief Judge, and LEWIS and BREITENSTEIN, Circuit Judges.

LEWIS, Circuit Judge.

This matter is before the court upon petition of the National Labor Relations Board seeking enforcement of its order entered in a proceeding under § 10(a) of the National Labor Relations Act, as amended, 29 U.S.C.A. 160(a), against respondent. The order is premised upon a finding that respondent had violated § 8(a)(3) of the Act [1] by discharging five employees and requires relief by reinstatement, reparation and the posting of appropriate notices. The order is resisted upon the claims that the discharged employees were agricultural laborers and thus not within the shelter of the Act and alternatively, that in any event the evidence before the Board did not demonstrate a violation of the Act.

Respondent is the sole owner of a 657-acre farm near Denver, Colorado, upon which he grows and produces farm and dairy products. The farm also serves as the locale for a commercial business of collecting, processing and distributing milk and milk products, eggs and other dairy products. This business serves hotels and restaurants, retail outlets, schools, hospitals and military installations, grossing over $1,250,000 per year. The source of supply for the business is neither solely nor principally from respondent's direct farming activities. He produces about 300 gallons of milk per day but obtains from other farms some 3,000 additional gallons for processing and distribution. All eggs sold from Schoenberg Farms come from outside sources of production. The discharged employees worked in the processing plant as distinguished from the farm proper. The determination of whether such employees are agricultural employees and so excluded from coverage is dependent upon the definition of "agriculture" in the Fair Labor Standards Act, Sec. 3(f), 29 U.S.C.A. 203(f),[2] as adopted under the National Labor Relations Act. N. L. R. B. v. Central Oklahoma Milk Producers Ass'n, 10 Cir., 285 F.2d 495; N. L. R. B. v. Olaa Sugar Company, 9 Cir., 242 F.2d 714.

Respondent urges that "dairying" is specifically mentioned in the statute as an agricultural operation and thus distinguishes the landmark case of Maneja v. Waialua Agricultural Co., 349 U.S. 254, 75 S.Ct. 719, 99 L.Ed. 1040, which found significance in the omission of sugar milling from the statute's language describing the area of agricultural operation. Further, respondent argues, the processes necessary to make milk and milk products marketable do not result in a product so dissimilar to the raw product as to be more akin to manufacturing than Agriculture, cf. Mitchell v. Budd, 350 U.S. 473, 76 S.Ct. 527, 100 L.Ed. 565.

---

1. 29 U.S.C.A. § 158.

"(a) It shall be an unfair labor practice for an employer—

\* \* \* \* \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization \* \* \*."

2. "'Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 1141j(g) of Title 12), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market."

However, controlling here is the language of the statute which exempts only that labor "performed by a farmer or on a farm as an incident to or in conjunction with such farming operations" and in construing this language the courts have been consistent in declaring that:

" * * * there is the additional requirement that the practices be incidental to 'such' farming. Thus processing on a farm, of commodities produced by other farmers is incidental to or in conjunction with the farming operation of the other farmers and not incidental to or in conjunction with the farming operation of the farmer on whose premises the processing is done. Such processing is, therefore, not within the definition of agriculture." Farmers Reservoir Irrigation Co. v. McComb, 337 U.S. 755, 766, footnote 15, 69 S.Ct. 1274, 1280, 93 L.Ed. 1672. See also Bowie v. Gonzalez, 1 Cir., 117 F.2d 11; Chapman v. Durkin, 5 Cir., 214 F.2d 360; Mitchell v. Huntsville Wholesale Nurseries, 5 Cir., 267 F.2d 286.

Dairying encompasses a great number of activities directed toward the production of milk, butter and cheese, and commonly entails two distinct businesses—that of the dairy farmer and that of the processor. The discussion of this Act in the United States Senate demonstrates clearly that the exemption was intended for the farmer and not the processor, 81 Cong.Rec., July 27, 1937, p. 7656. Accordingly, the Fair Labor Standards Act description of dairying was thus expanded by the administrator:

" 'Dairying' includes the work of caring for and milking cows or goats. It also includes putting the milk in containers, cooling it, and storing it where done on the farm. The handling of milk and cream at receiving stations is not included. Such operations as separating cream from milk, bottling milk and cream, or making butter and cheese may be exempt when performed by a farmer or on a farm if they are not performed on milk produced by other farmers or produced on other farms." 29 C.F.R. 780.11.

Such definition comports with the practicalities of the industry. See Maneja v. Waialua Agricultural Co., 349 U.S. 254, 75 S.Ct. 719, 99 L.Ed. 1040. Clearly, the respondent's operation relies chiefly upon its function as processor rather than dairyman and hence does not fall within the exemption of the statute. We conclude that the nature of the subject employees' duties was such as to give jurisdiction to the Board under the National Labor Relations Act.

■ We conclude, too, that the evidence of the circumstances surrounding the discharge of respondent's employees surpasses mere suspicion and is sufficient to meet the burden of establishing a prohibited motive for the discharges. The five employees, Guthrie, Gongwer, Davis, Bryant and Bradley, were summarily discharged on March 12, 1960. No reason was given for the discharge at that time and the respondent testified that all were "good workers," having been on his payroll for employment periods from 17 months to 12 years.

On the night previous to the mass discharge, the employees had attended a union organizational meeting at Gongwer's house and had all signed union cards. The supervisor of the plant, Frank Yatckoske, had also attended on invitation but refused to sign a card.

Yatckoske testified that he had not informed his employer of the meeting and the respondent testified that he had no knowledge of the interest of his employees in unionization. Respondent stated that he had fired the men for cause—the mishandling of a batch of chocolate milk, smoking, truck damage, inefficiency and wasting time, and failure to comply with health regulations as to uniforms. There was testimony that he had not complained to the individual employees of their work or attitudes prior to March 12, 1960, and at the time he discharged them he stated that there had been a change in the policy of the plant

or, in one instance, that the employee and he had had a "few disagreements" and that the employee had "wanted out so [he] could get out now." The oldest employee, Guthrie, testified:

"Q. Did Mr. Tepper, at that time, mention the union? A. No. he did not. He just said, here's your time.

"Q. What else did he say? A. He said I didn't think this of you. He met me at the door and give me my check and said I didn't think this of you.

"Q. Is that the entire conversation? A. No, I told him, well I'm going along with the men.

"Q. Is that all you said? A. And he said that it was a free country and he could do as he pleased and I could do as I pleased."

Although there was no direct testimony that respondent knew of the union meeting on March 11, the trial examiner found that respondent had discharged the men because of his belief that they had joined a union. Concerning this, the trial examiner stated:

"The triviality of some of the complaints concerning the discharged men voiced by the Respondent from the witness stand, and the staleness of others, his candid admission that all were good workers, and the rehiring of two of them within a period of three weeks supports the conclusion that Tepper made the discharges because of his belief that the men had joined the Union. How this knowledge came to him is a matter for inference from the established facts. A meeting with Union agents was held. The five men who were discharged on the following day attended and signed cards. Yatckoske was present. The likelihood that the plant superintendent would impart this information to the Respondent is a strong one. He was a part of management and, arguably at least had an obligation to acquaint Tepper with this development. I do not credit the denials of Tepper or Yatckoske in this particular. It is, of course, true that an employer may discharge as he pleases save only that his motivation may not be one proscribed by the Act. My conclusion as to motivation rests upon several factors. Considering that three of those discharged had been employed for a number of years and the other two for a number of months, it is unlikely that they were discharged upon a whim. Some motivation must have attended that decision. If considerations of employee efficiency and conduct were at all controlling it would seem that Yatckoske, the man in 'full charge of the plant' would have been consulted. He testified that he was not. The reasons given by Tepper in his testimony border on the frivolous. I do not believe them. * * *"

Respondent testified, and the testimony of Yatckoske and the rehired employees buttressed this testimony, that the plant operation had been more efficient since the employee reorganization.

■■ The responsibility of determining credibility as a basis for disputed fact rests with the fact finder and although the Board has the burden of establishing a motive for a discharge outlawed by the Act, Miller Electric Manufacturing Co. v. N. L. R. B., 7 Cir., 265 F.2d 225; N. L. R. B. v. Ferguson, 5 Cir., 257 F.2d 88, we do not find that the evidence supporting the findings here, albeit circumstantial, lacks substantiality when the record is considered as a whole, Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; 29 U.S.C.A. 160(e). It is true that there was direct evidence, given by the employer himself, that he had neither knowledge of the unionization nor an anti-union animus, and it is also true that the record demonstrates no means by which knowledge of his employees' activities was conveyed. However, in addition to the discharge of all the employees who signed union cards on the day following the meeting, the employer's conversation

with the employee Guthrie was interpreted by the latter to be a declaration that he was being discharged for promoting unionization and is certainly capable of that meaning. The statement concerning Guthrie's right to do as he pleased in a free country would not ordinarily call up negligence or disloyalty in the employer's business.

·Human qualities, such as motive, can only be shown circumstantially where the possessor has not previously revealed them directly, but the circumstances may outweigh in credibility a direct statement on trial. I Wigmore on Evidence § 25. The particular circumstances here, including the lack of reprimands for conduct which occurred sometime previous to the discharge, the coincidence of time, the statements upon discharge, and the discharge of only those men who attended the meeting and signed union cards are convincing upon the cold record and were apparently so to the examiner who observed the witnesses as they testified.

The petition for enforcement is granted.