**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**KELLY BROTHERS NURSERIES, INC., Respondent.**

**No. 206, Docket 29055.**

United States Court of Appeals
Second Circuit.
Argued Dec. 2, 1964.
Decided Feb. 5, 1965.

James L. Burke, Elmira, N. Y., for Kelly Brothers Nurseries.

Allison W. Brown, Jr., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Michael N. Sohn, Washington, D. C.,

Atty.), for National Labor Relations Board.

Before FRIENDLY and SMITH, Circuit Judges, and BLUMENFELD, District Judge.*

FRIENDLY, Circuit Judge:

The National Labor Relations Board seeks enforcement of an order, 145 N.L.R.B. No. 63 (1963), see also 140 N.L.R.B. 82 (1962), which found a nurseryman guilty of a refusal to bargain and other unfair labor practices toward a union seeking to organize his employees and toward such employees. The employer's objection relates solely to 47 employees contended to be exempt as agricultural laborers.

From its enactment in 1935, 49 Stat. 450, the National Labor Relations Act has provided, § 2(3), that "the term 'employee' * * * shall not include any individual employed as an agricultural laborer * * *." The basic rights of self-organization, of collective bargaining through representatives of their own choosing, and of engaging in other concerted activities, outlined in § 7 of the Act, are conferred only upon "employees," and the unfair labor practices on the part of an employer defined in §§ 8(a)(1), (3) and (5) of which respondent was found guilty are stated in terms of "employees" or "employment." Until July, 1946, there was nothing to supplement § 2(3) by way of guidance as to the meaning of "agricultural laborer." Since then Congress has regularly added to the annual appropriations for the Board a rider, the most recent of which is the Act of September 19, 1964, Tit. III, 78 Stat. 959, that none of the Board's funds "shall be * * * used in connection with investigations, hearings, directives, or orders concerning bargaining units composed of agricultural laborers * * * as defined in section 3(f)" of the Fair Labor Standards Act of 1938, 29 U.S.C. § 203(f), which we quote in the margin,[1] along with the result of our study of the history of initial enactment of the rider.[2]

We take the facts primarily from the Board's decision and direction of election, 140 N.L.R.B. 82, and the Intermediate

---

* Sitting by designation.

1. " 'Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities * * * the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market."

2. The 1946 rider was the product of heated debate and of sharp conflict between the two houses, which unfortunately sheds relatively little light on its interpretation. As proposed by Representative Elliott of California and as adopted by the House, it would have banned the use of NLRB funds when a proposed unit was composed, in whole or in part, of agricultural laborers as that term was generously defined in the Social Security Act, a modified version of which is now

42 U.S.C. § 410(f), 92 Cong.Rec. 6689, 6692 (1946). After the rider had been bitterly attacked before a subcommittee of the Senate Committee on Appropriations, Hearings on H.R. 679, 79th Cong., 2d Sess. 235, 239, 246 (1946), the Senate struck it out, 92 Cong.Rec. 7945. After protracted disagreement between the houses, the conflict was suddenly resolved by adoption of the rider incorporating the Fair Labor Standards Act definition and eliminating the provision as to "contamination" by a single agricultural worker. The House Report merely describes the compromise, H.Rep. 2578, which the House approved without debate, 92 Cong.Rec. 9494. In a brief debate prior to Senate approval it was stated that the NLRB had been consulted and accepted the revised rider which was far narrower than its predecessor; that the revised rider was confined to operations "on the farm"; and that the NLRB regarded this as producing "very minor" changes in existing law, 92 Cong.Rec. 9514–15. About all one can be sure of is that Congress wished some expansion in the agricultural exemption but not so much as the House rider would have afforded.

Report of the Trial Examiner in the subsequent unfair labor practice case:

Kelly Brothers Nurseries, Inc., is a large producer of nursery stock, with headquarters at Dansville, N. Y. There it owns a 40-acre tract on which warehouses are located, and operates 14 nearby farms on which trees and shrubs are grown. In addition to selling nursery stock raised on these farms, Kelly Brothers markets some purchased items, which constitute 28% of its gross sales.[3]

Kelly Brothers' employees are divided into three groups: regular year round employees; "three-season employees," so called because they do not work in the winter; and employees hired mainly for the busy shipping season in the spring. As the case stands before us, the controversy concerns only the first two groups who, in 1962, numbered 30 and 17, respectively, as compared with 106 in the third. During the spring season, March 15–June 1, these 47 employees spend half their time in the fields, trimming trees, cutting tops, cultivating and propagating trees, and the other half in the warehouses preparing for shipment products grown by Kelly Brothers and purchased by it. From June 1 to October 15 the warehouses are closed and the 47 men are constantly in the fields. From October 15 until the end of the digging season in December, the 47 employees are solely engaged in digging Kelly Brothers' own nursery stock, except that from the middle of November until the digging is completed, five or six are assigned to the warehouses to unload and store the trees that they and their comrades have dug. From early December until March 15, the 30 employees spend most of their time in the warehouses, with six devoting some time to receiving, grading and storing purchased products, and the others working entirely on Kelly Brothers' own stock; five or six also spend some time in the fields when weather permits.

On March 29, 1962, the secretary of Retail Store Employees Union, Local 345, wrote Kelly Brothers "that a vast majority of your employees have authorized this Union to represent them for the purpose of negotiating a collective bargaining agreement" and requested a date to prove the union's majority and begin negotiations. Nothing in the letter limited the request to work done in the warehouses as distinguished from work in the fields. The Kellys said they would not bargain with the union and that their attorney would act for them. After some delays, the attorney informed the union that the company would not bargain since it considered that its employees— apparently all of them—were "agricultural laborers" and thus were not "employees" within the meaning of the Act.[4] Before this Kelly Brothers had engaged in what the Board found to be coercive questioning and other unlawful anti-union activities. A strike began on April 18 and lasted until May 25. Kelly Brothers engaged during the strike in acts found to constitute coercion and after its cessation in acts found to discriminate as to reinstatement. The Board also concluded that Kelly Brothers had unlawfully refused to bargain with a union which it should have known to represent a majority of the employees.

Following the filing of unfair labor practice charges in April, the union, on May 2, filed a petition under § 9(c) of the Act, on which hearings were held in May and June. It sought an election for a unit consisting of all Kelly Brothers' employees at Dansville "including ship-

3. The percent of warehouse *time* spent on purchased goods, which would seem a more relevant figure, is significantly lower. A Kelly Brothers' witness testified that the percentage of purchased items to total items handled (as distinguished from their resale value) is only 14%. In addition, the evidence was that the warehouse work devoted to preparing (e. g., trimming, bagging, checking) home-grown items for sale was greater than that expended on purchased stock, which requires unloading but arrives in a far more advanced state of preparation.

4. Kelly Brothers later unsuccessfully contended that the 106 employees hired only during the spring season were casual employees. See 140 N.L.R.B. at 85–86.

ping, retail sales, packing, maintenance, truck drivers and all other non-agricultural employees whether in whole or in part" but excluding "office clerical employees, guards, professional employees, supervisors as defined in the Act, and other employees excluded by statute." In its decision and direction of election dated December 11, 1962, the Board defined the unit as "all warehouse employees, including shipping, packing and maintenance employees and truck drivers employed by the Employer at its Dansville, New York, warehouses, but excluding office clerical employees, professional employees, agricultural laborers, guards, night watchmen, and supervisors, as defined in the Act." It recognized, 140 N.L.R.B. at 84, that the field work was within the "primary" and the warehouse work in Kelly Brothers' own products within the "secondary" definition of agriculture, Farmers Reservoir & Irrigation Co. v. McComb, 337 U.S. 755, 763, 69 S.Ct. 1274, 93 L.Ed. 1672 (1949), but held, on the basis of practices adopted by the Fair Labor Standards Administrator, that the exemption was lost, as to all employees, because of the work done in the warehouses on purchased products. After the decision and direction of election was issued, the union withdrew its representation petition, and amended the unfair labor practice charges it had filed in the spring of 1962. This led to a complaint charging both coercion and refusal to bargain, and, after hearing and report, to the order here sought to be enforced. As noted, the employer does not contest this save as to the 47 regular and three-season employees.

It seems important to clarify the posture in which the case stands before us. The Board concedes that the field work was agricultural and that the work in the warehouses would also be if all of it had been performed on Kelly Brothers' own products. Contrast the sugar processing operations in Maneja v. Waialua Agricultural Co., 349 U.S. 254, 264–270, 75 S.Ct. 719, 99 L.Ed. 1040 (1955). The respondent now makes no contention that the 106 spring season employees were exempt,

and we shall hold it to that concession, without implying whether it was a necessary one.

The Board's conclusion that the exemption was lost, even as to the 47 employees, stems, as we have said, from regulations under the FLSA. Although § 13(a) of that Act, 29 U.S.C. § 213(a), says that the minimum wage and maximum hour provisions "shall not apply with respect to * * * (6) any employee employed in agriculture," the Regulations of the Department of Labor prescribe that "where an employee in the same workweek performs work which is exempt under this section 13(a)(6) and also engages in work to which the Act applies, not exempt under this or any other section of the Act, he is not exempt that week, and the wage and hour requirements of the Act are applicable." 29 C.F.R. § 780.110 (1964). A further regulation indicates that nursery warehouse employees are exempt "provided they handle only products grown by their employer and their activities * * * are subordinate to his [the employer's] farming operations." 29 C.F.R. § 780.178 (1964). Taking the two regulations together, if any of the 47 employees spent only part of a week processing goods as to only part of which Kelly Brothers was acting as a jobber, he was outside the FLSA's agricultural exemption *for that week*.

▪ After some backing and filling, see L. Maxcy, Inc., 78 N.L.R.B. 525 (1948), overruled by Clinton Foods, Inc., 108 N.L.R.B. 85 (1954), overruled by H. A. Rider & Sons, 117 N.L.R.B. 517 (1957), the Board, drawing on the example of the FLSA regulation, now takes the position that "employees who perform *any regular amount* of nonagricultural work are covered by the Act with respect to that portion of the work which is nonagricultural," Olaa Sugar Co., 118 N.L.R.B. 1442, 1443 (1957). It is not clear just what the Board means by the final phrase, which it paraphrased in the election decision in the instant case, 140 N.L.R.B. at 85 n. 7. The Olaa case did

not demand such clarification; the issue was not the duty to bargain but rather the discriminatory discharge of a single employee whose duties, half of which were nonagricultural, were the same throughout the year. But the instant decision must mean that the Board takes the view that if a man engages to more than a de minimus extent in activities not within the FLSA agricultural exemption, he is subject to the National Labor Relations Act at least for any function (here the warehouse work) in the course of which he performs non-exempt activities and perhaps for the entire period in which he performs that function.

The Board justified this in Olaa on the bases "that Congress intended the Board to apply the law as established under that [Fair Labor Standards] Act" and "to follow the rules laid down by the courts, if not by the Department of Labor, under that Act"; that "considerations of comity between two agencies of the Government make it desirable that the view of the agency most often concerned with a problem be respected by the agency to which the problem is relatively incidental"; and that "the same principles of policy and statutory construction which motivated judicial construction of the Fair Labor Standards Act would appear to apply with equal force to the National Labor Relations Act." 118 N.L.R.B. at 1444. When the issue is whether particular work is or is not agricultural, these views are salutary and sound.[5] But when the issue is whether a small amount of nonagricultural work converts one who would otherwise be "an agricultural laborer" under § 2(3) into one who is not, the questions "of policy and statutory construction" under the two acts are altogether different. Assignment of a man to covered wage and hour status under the FLSA for a particular workweek in which he has engaged in appreci-

able non-exempt work has no implications for other work weeks, or other men. Labor relations know no such watertight compartments. A ruling that the 47 employees are subject to organization under the protection of the National Labor Relations Act for their warehouse activities will almost inevitably result, if the union is successful, in their being organized for weeks in the warehouse in which some or many may have no contact with purchased products; it may well extend the Act to field work performed during the winter and spring seasons and perhaps, in practical import, to field work the year round. To be sure there is nothing unlawful in the organization of persons engaged solely or predominantly in agricultural work, and we perceive the problems in reconciling the Congressional policy in favor of exemption of agricultural labor from the protection of the Labor Relations Act with the desideratum that persons working alongside others not engaged in such labor should not be excluded from the bargaining unit. But we see no reason for believing that, by regularly enacting riders incorporating the FLSA's broad definition of agriculture, Congress meant to relieve the Board of the task of developing an approach to this question of mixed work that is suitable in the light of the principles, the policies and the administrative problems of the National Labor Relations Act, and instead to permit mechanical adoption of the practice developed by the Department of Labor to meet the altogether different problems of the FLSA—particularly when this would often restrict an exemption which Congress intended to expand. The Board's reliance on cases holding that a small percentage of annual time spent on work outside the definition of § 3(f) of the FLSA, such as our decision in Wirtz v. Jackson & Perkins Co., 312 F.2d 48, 51 (2 Cir.1963),[6] will bring the wage and

5. See, e. g., William H. Elliott & Sons, 78 N.L.R.B. 1078 (1948); Michigan Peat, Inc., 127 N.L.R.B. 518 (1960); Snake River Trout Co., 129 N.L.R.B. 41 (1960).

6. The record in that case does not translate the small annual totals of work on purchased stock into percentages for the particular employees and work weeks involved.

hour provisions of that Act into play for particular men and work weeks, and on advice from the Department of Labor "that it considers all employees who work on mingled stock to be engaged in covered employment," 140 N.L.R.B. at 84, was thus misplaced.

The Board reached an entirely permissible result in Rider, supra, 117 N.L.R.B. 517, where it applied the Act to employees spending 70% of their time at an apple processing plant, only 5% of whose product was grown by the employer. These employees were primarily nonagricultural, and the Board did not say in that opinion that anything more than a de minimis amount of time on nonagricultural work would defeat the exemption; indeed, it explained, 117 N.L.R.B. at 5201 n. 4, "We find it unnecessary to lay down a general rule in this case as to what proportion of time spent in non-agricultural work is necessary for inclusion in the unit." Neither do we have any quarrel with the actual decision in the Olaa case; Banez, the employee there in question, was a truck driver, who, along with others, spent substantial time —at least 50%, see NLRB v. Olaa Sugar Co., 242 F.2d 714, 715, 722 n. 7 (9 Cir. 1957)—in hauling sugar cane grown by other producers. Neither of those cases presented the problem here at issue where the 47 employees are solely agricultural laborers from June to December and are predominantly engaged in agricultural work for the balance of the year.

■■ Since the order sought to be enforced was based on a standard borrowed from the practice of the Fair Labor Standards Administrator, which we deem inappropriate for the resolution of the problem here at issue, we should be obliged at minimum to remand. SEC

v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). Fully recognizing the latitude for the framing of policies to meet this problem which the Board requires, we are convinced that no standard reconcilable with the expressed will of Congress would authorize the instant order as regards the 47 employees. Taking their year round activity as a whole, this is almost completely agricultural.[7] Even during the spring season, when alone they work alongside other employees, the proportion of their total time on non-exempt work is 14% on the figures used by the Board—since they are indoors only half the time—and more like 7% on a more reasonable computation, see fn. 3. Even if the order means that they are subject to the Act only for their warehouse work, the non-exempt proportion on the latter basis is 14% or less. Such small proportions are inadequate to tip the scales in favor of bringing these men, who would be regarded as farmers on any realistic view, within the National Labor Relations Act.

None of the judicial decisions relied on by the Board supports its position. Cases under the Fair Labor Standards Act are not truly apposite, for reasons already developed; and none of these, save possibly one phase of our Jackson & Perkins decision, see fn. 6, goes so far as the Board has gone here. NLRB v. Olaa Sugar Co., supra, held that the Board had erred in finding that a truck driver hauling about equal amounts of employer-grown and nonemployer-grown sugar was in no way engaged in agriculture, and remanded for the Board to determine what should be done about him in the light of that holding. In NLRB v. Tepper, 297 F.2d 280 (10 Cir.1961), the employees worked entirely in a farmer's processing plant, almost all of

7. The evidence indicated that the 30 regular employees spent 68% of their time in the fields, and that the three-seasons employees spent 77% of their time there. Even if we should follow the Board in taking the figure of 28% of gross sales represented by purchases from other growers as controlling, the proportion of the year round time of these workers spent on agricultural activities within the definition of § 3(f) becomes 91% and 93.6%, respectively. Use of the more likely 14% figure, see fn. 3, would raise these to 95.5% and 96.8%.

whose products came from outside sources. Waldo Rohnert Co. v. NLRB, 322 F.2d 46 (9 Cir.1963), concerned employees who spent the greater portion of their time in a farmer's seed mill, 75% of whose product, as the court found, was grown by other farmers. NLRB v. Sweetlake Land & Oil Co., 334 F.2d 220 (5 Cir.1964), sustained denial of the exemption as regards employees in a rice drying plant, 20% of whose rice came from outside producers. This last decision would give some support to the Board's denial of exemption to the 106 spring employees of Kelly Brothers, but that issue is not before us and we therefore need not consider whether or not we would follow Sweetlake on its facts.

■■ Our decision that Kelly Brothers was warranted in resisting organization of the 47 regular and three-season employees does not lead to the conclusion that the Board's order is wholly invalid; indeed, respondent does not claim this. We think the Board may properly decide that when a union seeks to organize some persons as to whom the employer may lawfully resist and some as to whom, in view of Kelly Brothers' concession, we shall assume it could not, the employer has committed an unfair labor practice if it engages in coercive or discriminatory tactics with respect to the latter, as Kelly Brothers seems to have done in a few instances here. Whether the Board may find a refusal to bargain under such circumstances is a different matter—if a union insists on speaking on behalf of persons for whom it cannot properly so insist, an employer cannot be faulted for refusing to bargain. In this case, however, respondent has conceded an obligation to bargain with the union as representing the seasonal employees, and the Board may therefore require this. We shall hold the case for sixty days for the presentation, on notice to respondent, of a revised order consistent with this opinion; unless such an order is submitted within that period, enforcement will be denied.