**DON LEE DISTRIBUTOR, INC. (Warren); Don Lee Distributor, Inc. (Dearborn); Powers Distributing Company, Inc.; Eastown Distributors, Co.; Hubert Distributors, Inc.; and Oak Distributing Co., Petitioners/ Cross-Respondents,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner,**

**International Brotherhood of Teamsters, Local 1038, Intervenor.**

**Nos. 96–6704, 97–5140.**

United States Court of Appeals, Sixth Circuit.

Argued March 19, 1998.

Decided June 2, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied July 10, 1998.

Rosemary M. Collyer (argued and briefed), Crowell & Moring, Washington, DC, Patrick W. Jordan (briefed), Bradford K. Newman, Jeffer, Mangels, Butler & Marmaro, San

Francisco, CA, for Petitioners/Cross–Respondents .

Sharon I. Block (argued and briefed), National Labor Relations Board, Office of the General Counsel, Washington, DC, Aileen A. Armstrong (briefed), Linda Dreeben (briefed), John Burgoyne, National Labor Relations Board, Appellate Court Branch, Washington, DC, for Respondent/Cross–Petitioner.

Samuel C. McKnight (argued and briefed), Lisa M. Smith (briefed), Klimist, McKnight, Sale, McClow & Canzano, Southfield, MI, for Intervenor.

Before: BOGGS, NORRIS, and MOORE, Circuit Judges.

## OPINION

BOGGS, Circuit Judge.

This case comes to us on the petition of six Detroit-area beer distributors (collectively, "Distributors") to review an order of the National Labor Relations Board ("NLRB") finding that the Distributors committed unfair labor practices in violation of Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("NLRA"), and on the NLRB's cross-petition for enforcement of its order. We are confronted with two issues: first, whether the Distributors' conduct during collective bargaining sessions with the union representing their employees constituted unlawful "joint" or "multiemployer" bargaining, or merely constituted permissible "coordinated" bargaining; and second, whether the NLRB was time-barred from pursuing a claim against the Distributors based on unlawful multiemployer bargaining.

## I

The Distributors are wholesale beer distributors operating in the Detroit area. Each of the six Distributors is separately owned and operated, except that Don Lee Distributor, Inc. (Warren) and Don Lee Distributor, Inc. (Dearborn), are both owned by a single parent company. The employees at each of the Distributors comprise separate bargaining units. For many years, the Distributors' drivers, warehouse employees, and reclamation employees have been represented for collective bargaining purposes by Local 1038, International Brotherhood of Teamsters, AFL–CIO ("Union"). In 1987, the Distributors joined forces with other beer distributors in the area to form the Downriver, Detroit, Oakland, and Macomb Wholesalers Association, Inc. ("DDOM") in an effort to negotiate more favorable terms with their respective groups of employees. Their efforts through the DDOM were unsuccessful; after a 12–week strike, the Distributors—apparently confronted with something of a "Prisoner's Dilemma"—were left to the "mercy of other ... wholesalers" as several other DDOM members made individual deals with the Union on terms more favorable to the Union than the Distributors and other DDOM members originally had anticipated.

Dissatisfied with their DDOM experience, the Distributors decided in January 1990 to withdraw from the association. Executives of each of the Distributors had met in December 1989 with Fred Long, the chief executive of a labor-relations firm called West Coast Industrial Relations Association, Inc. ("West Coast"), to discuss alternative ways of bargaining together to increase their bargaining power relative to the Union. Long told the Distributors that the problem with the 1987 DDOM negotiation was that the structure of DDOM permitted the Union to "whipsaw" DDOM members in the collective bargaining process.[1] To combat the whipsawing problem, Long advised the Distributors to enter into a mutual aid pact ("Pact") that provided, in pertinent part, as follows:

---

1. "Whipsawing" is a "union stratagem seeking to obtain benefits from a number or group of employers by applying pressure to one, the objective being to win favorable terms from the one employer and then use this as a pattern, or perhaps a base, to obtain the same or greater benefits from the other employers, under the same threat of pressure (including a strike) used against the first one." *See* ROBERTS DICTIONARY OF INDUSTRIAL RELATIONS (rev. ed.1971); *see also* WEBSTER'S THIRD NEW INT'L DICTIONARY (1986) ("3: to use more favorable terms gained (as in one company) as the precedent or leverage to win equal or greater concessions from (as a related company).").

1. Each Distributor shall enter into its own Agreement with the Union. Nothing contained herein shall be construed to reflect a multi-employer association nor create a multi-employer unit. This document reflects a coordinated bargaining effort among individual and independent Distributors.

2. Each Distributor shall share costs and expenses of Fred R. Long and his associates who shall represent the Distributors['] bargaining efforts with the Union. . . .

\* \* \*

7. Distributors agree to the establishment of the minimum objectives, described in Exhibit B, for a new Collective Bargaining Agreement which can only be changed by a majority vote of the participating Distributors.

8. In the event any Distributor is in breach of this Agreement or negotiates directly with the Union (or any other Union or person or group who allegedly is representing this Union's Interest) or agrees to settle on terms and conditions in excess of those listed in item 7 herein above, that Distributor, in addition to any other damages for breach of this Agreement that may occur in any enforcement law suit brought by any of the other Distributors shall, in addition, pay to each of the other Distributors a penalty fee of $400,000 to each.

The "minimum objectives" mentioned in Paragraph 7 of the Pact, which vary markedly in relative specificity, were listed as follows:

1. Eliminate eight (8) hour minimum/maximum day.
2. Remove load limit.
3. Overtime after forty (40) hours per week.
4. Management rights clause.
5. More restrictive grievance procedure.
6. Single pay holidays.
7. Simplified vacation language.
8. Four (4) weeks maximum vacation, red circle everyone over.
9. Cooler and basement deliveries required.
10. Reduction in wages.
11. Refined benefit pension plan—percentage of earnings.
12. Insurance revisions.
13. No curfew.
14. Bulk deliveries.
15. Zipper clause.
16. Empty pick up rate.
17. Longer probation period.
18. No restrictions on number of part-time employees.
19. Reduction on commission when helper is used.
20. More flexibility with reclamation duties.
21. Common expiration date.
22. Minimum three year contract.

On January 18, 1990, the Distributors signed the Pact.

As the existing DDOM contract was set to expire in May 1990, the Distributors and the Union began making plans for a new round of collective bargaining in March 1990. Early on, Long's associates (on behalf of the Distributors) broached the idea of "joint" or "concurrent negotiations," but Robert Knox, the president of the Union and the chief Union negotiator, initially rejected this idea. On March 27, 1990, the Distributors and the Union held an initial meeting to discuss collective-bargaining issues. At this meeting, Long presented a memorandum to Knox detailing the Distributors' initial position. This memorandum stated that "the bargaining positions of each [Distributor] are the same and any proposal I offer for any one of them will be identical for the others for delivery department and warehousing department personnel representing the bulk of each bargaining unit." On the other hand, the memorandum also stated that "[i]t may also develop through the negotiating process even for delivery department or warehouse department personnel, that it is advantageous for a certain company and the union to agree on a provision not acceptable to other companies or the union. Although the companies do not contemplate such differences, it

is possible they may develop as issues are discussed. Such agreed upon differences, if any, would be incorporated into that company's contract."

At the March 27, 1990, meeting between the Distributors and the Union, Knox specifically asked Long whether the Distributors had entered into any kind of mutual aid pact. Instead of disclosing the existence and terms of the Pact, Long replied that the possible existence of a mutual aid pact was "none of his business and that it was not relevant to bargaining." Long did volunteer, however, that the Distributors had *not* pledged to negotiate exclusively through Long and that they could "retain someone else without penalty." Faced with Knox's reluctance to participate in any "joint" or "concurrent" bargaining, Long told Knox that if the Union insisted on separate bargaining, Long would conduct the bargaining session for one of the Distributors, after which a representative of one of the Distributors would insist on identical contract terms for each of the other five Distributors. Rather than participate in such a futile endeavor, Knox agreed to try the joint bargaining approach and "see how it progressed."

The first actual bargaining session was held on April 18, 1990. On that date, the parties exchanged initial proposals. Long presented six identical proposals, one for each of the Distributors. Knox therefore asked again whether there was an association or other collective understanding among the Distributors. Long again refused to answer and stated that "that wasn't an appropriate subject for bargaining." Bargaining continued, with little progress, through April and most of May 1990.[2] At a bargaining session held on May 22, 1990, the question of whether the Distributors were engaging in joint bargaining came up again, and again Long gave a somewhat evasive answer that suggested that certain Distributors could well end up agreeing to different contract terms. Despite this response, on June 8, 1990, Long wrote to Knox making clear that the Distributors would have a common, identical posi-

tion on all major subjects of collective bargaining: Long stated that "*[w]e* are coming close to having everything *we* need to refine *our* first proposal next week.... *We* will have *our* position on this issue refined soon.... *[O]ur* economic package, as it may develop in negotiations, will be conditioned on resolution of non-economic language and specifically elimination of restrictive provisions *we* define as featherbedding." (emphasis added). Sure enough, at the June 19, 1990, bargaining session, the Distributors once again presented six identical proposals, one for each Distributor.

In the late June and early July 1990 bargaining sessions, the Union representatives began insisting on separate bargaining. The Distributors vigorously resisted this idea, stating through Long at one point that "[t]he contract for all the distributors we represent is essentially identical.... [W]e believe that this ploy ... represents nothing more than yet another dilatory tactic on your part." Nonetheless, the Union went forward with its plan, identifying specific issues unique to particular Distributors. For example, on July 16, 1990, the Union presented a comprehensive proposal covering only the Powers Distributing Co. bargaining unit. On July 18, 1990, the Union proposed implementing a "daily route bidding system" at Don Lee (Dearborn). In response to these individualized proposals, the Distributors incongruously responded with six identical counterproposals—even though the Union had made no proposal with respect to four of the six Distributors. On August 8, 1990, after the Distributors mysteriously made identical counterproposals despite the uniqueness of the Union's two Distributor-specific proposals, the Union requested that Long's associate, Chris Thomas, provide a copy of all documents showing the relationship between West Coast and the Distributors. Thomas refused to provide the requested documents, stating that they were confidential.

On September 5, 1990, Thomas informed the Union that the Distributors' counterpro-

**2.** Tellingly, on April 20, 1990, the Distributors sent a joint letter to their retail customers with numerous collective references: "our contract," "we are asking the union to eliminate feath-

erbedding practices," and the like. They also formed a collective group called the Coalition for Job Preservation, publishing letters in local newspapers to similar effect.

posals on the route-bidding issue—the issue raised by the Union only with respect to one of the Distributors—were withdrawn because the Union had not responded to them. On September 11, 1990, West Coast transmitted what it called the Distributors' final offer, making clear that the Distributors were presenting "complete and identical"offers. At the same time, West Coast declared an impasse because of the apparent futility of further negotiations over such issues as compensation for drivers and co-payment of health care premiums. At the next bargaining session, on September 20, 1990, Knox specifically asked the Distributors whether there was "a written or oral document that binds you distributors together in any way." Two different Distributor representatives specifically said that there was no pact of any kind among the Distributors.

Between October 1990 and January 1991, several bargaining sessions were held at which the Union attempted to get the Distributors to consider Union proposals that raised issues unique to particular Distributors. The Distributors essentially rejected these overtures, continuing to assert that the Distributors had identical positions on all issues. Finally, on January 14, 1991, Thomas sent Knox a letter by certified mail stating:

> Mr. Knox, *we are at impasse at Eastown, Don Lee Pontiac, Don Lee Dearborn, Oak, Powers, and Hubert.* Each has the same identical position on the ten (10) key items herein noted amongst others. If there is no agreement on these ten (10) items, there can be no agreement with any of them.

On January 30, 1991, the Distributors simultaneously notified the Union that they would unilaterally implement the non-economic portions of their final offer on February 7, 1991. On April 10, 1991, the Distributors notified the Union that they would implement the economic portions of their final offer on April 15, 1991.

The parties held another bargaining session on July 12, 1991. At this session, an attorney for the Union requested production of any document "that spelled out the employers' relationship to each other for purposes of collective bargaining." The Union's attorney also specifically asked whether "there were any penalty provisions amongst the distributors." Thomas, representing the Distributors, declined to provide the requested information. Thomas later took the position that the Pact was subject to the attorney-client privilege because Long (whose signature does not appear on the Pact) is a member of the Michigan bar.[3]

Several months later, two individual distributors unilaterally changed the conditions of employment for Union members in ways that are contested in this case. In November 1991, Don Lee (Dearborn) changed its drivers' routes based solely on the drivers' performance, without regard to seniority, and without the opportunity to bid on routes that had been respected under the 1987 DDOM contract. In July 1992, Powers Distributing informed its drivers that it would discipline any driver who returned an improperly filled empty can collection bag (referred to by the Union as Powers's new "can bag" policy), despite the fact that under the 1987 DDOM contract drivers were not penalized for inadvertently returning less-than-full bags of aluminum cans for recycling.

## II

Because the Distributors assert a limitations defense, we find it useful to summarize in detail the procedural history of this case; in doing so, we bear in mind the critically

---

**3.** We recognize that the record contains some evidence suggesting that West Coast disclosed at least the existence of some kind of agreement early in the negotiations. For two reasons, we do not discuss this evidence in detail. First, in reviewing the NLRB's order our only task is to ascertain whether substantial evidence supports the order, and not irrespective of whether there is evidence that could support a contrary conclusion. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Second, the disclosure of the *existence* of the Pact is immaterial to the legality of the Distributors' conduct. As explained below, an agreement providing for coordinated bargaining is perfectly lawful, while one that provides for multiemployer bargaining without the Union's consent is a violation of the NLRA. Thus, the question is whether the Distributors disclosed the *terms* of the Pact, not merely whether the Distributors disclosed its existence.

important fact that the Distributors consistently refused to disclose the terms of the Pact until an exceedingly late date.[4]

The charge at issue in this case was filed by the Union on April 3, 1991. The charge alleged simply that "[i]n the six months prior to the filing of this Charge, the Employer[s] ha[ve] violated Section 8(a)(5) of the [National Labor Relations] Act by bargaining in bad faith and by, on or about February 4, 1991, unilaterally implementing terms and conditions of employment prior to reaching a *bona fide* impasse." On June 20, 1991, the Regional Director of the NLRB declined to issue a complaint with respect to the Union's allegations. In particular, the Regional Director concluded that there was no evidence that the Distributors had unlawfully engaged in multiemployer bargaining without the Union's knowledge or consent:

> The investigation revealed that above six Employers all secured the services of the same labor relations consulting firm to represent them in their efforts to reach agreement with the Charging Union regarding a collective bargaining agreement. The Employers admittedly sought the same contract language and bargained to that end.

> The parties met regarding each of the six companies on a rotating basis. There is no evidence that the Employers wished to change the scope of the six individual units or combine them into one unit. Nor is there any evidence that, in the event an overall agreement is reached, that the Employers intend not to bargain individually over issues which might pertain to each respective company. I conclude that the Employers are permitted to bargain in a group with a single representative of their

choice and to negotiate for identical language in their collective bargaining agreement with the Charging Union.[5]

In reaching this decision, the Regional Director did not have the benefit of seeing the text of the Pact.

The Union appealed the Regional Director's refusal to issue a complaint based on the Distributors' alleged unlawful multiemployer-bargaining practices. In connection with this appeal, Long wrote a letter to the NLRB's Office of Appeals in which he stated that, while the Distributors did have a "mutual aid pact," it was solely for the purpose of sharing the cost of negotiations and contained no provision "that would restrict [the individual Distributors'] bargaining." On July 28, 1992, the Office of Appeals sustained the Regional Director's decision, stating that "the evidence was insufficient to meet the burden of establishing that [the Distributors] had entered into an agreement to restrict separate agreements by the parties or that [the Distributors] had attempted to combine all the bargaining units into one unit." The record before the Office of Appeals did not include a copy of the Pact.

Notwithstanding his initial refusal to file a complaint, on July 26, 1991, the Regional Director did issue a complaint challenging two specific aspects of the Distributors' February 1991 actions: their imposition of a longer probationary period for new employees, and their new classification of "casual" employees. Shortly thereafter, the Regional Director amended the complaint to challenge the legality of the Distributors' unilateral implementation of its economic proposals in April 1991 without first reaching a bona fide impasse.

---

4. For example, in March 1990 (three months after the Distributors entered into the Pact), one of the Distributors failed to produce a copy of the Pact in response to a subpoena that requested "[a]ny and all documents ... pertaining to the Employer's membership or participation in *any* employer association or to the Employer's assignment of bargaining and/or representational rights and/or responsibilities to any such employer association or entity or individual including West Coast Industrial Relations, Fred Long, Patrick Jordan, or the firm of McLaughlin and Irvin from January 1, 1988 to the present."

5. The Union, as intervenor, has opposed the Distributors' motion to take judicial notice of the Regional Director's decision, although the NLRB has not (and, indeed, has stipulated to its authenticity). Pursuant to Fed.R.Evid. 201, we have held that it is appropriate to take judicial notice of "adjudicative facts" such as agency and judicial decisions, even where those decisions contain disputed statements of fact, as long as we take judicial notice for some purpose other than to take a position on the disputed fact issue. *See, e.g., United States v. Garland,* 991 F.2d 328, 332 (6th Cir.1993).

The Distributors did not produce a copy of the Pact until the beginning of the administrative hearing in this matter (on November 16, 1992), after a subpoena had been issued for its production. Shortly thereafter, the General Counsel moved to amend the complaint to allege that the Pact,

> which was concealed from the Union, was actually an agreement forming "a de facto multi-employer association and/or bargaining coalition" and that from March 27, 1990, the first negotiating session, [the Distributors] bargained illegally as a multiemployer association or engaged in coalition bargaining, without the Union's consent. Thus, no valid impasse was reached. Furthermore, [the Distributors'] multiemployer or coalition bargaining was "bad faith and/or surface bargaining," but only from October 3, 1990, which was 6 months prior to the filing of the charge.

Over the Distributors' objection, the administrative law judge ("ALJ") granted the General Counsel's motion to amend the complaint.[6]

After a lengthy hearing, the ALJ ruled in favor of the General Counsel in an opinion dated December 1, 1994. The ALJ found that the Pact created an unlawful multiemployer bargaining collective that rendered the entire course of the Distributors' conduct toward the Union unlawful. Accordingly, the ALJ ordered "that all Respondents . . . rescind the February 7 and April 15, 1991 implementations of the last, best, and final offers and restore all terms and conditions of employment to the status quo before the unilateral changes, to the extent that such were detrimental to its employees. That includes eliminating the new casual employee classification and probationary employee clause and making whole those employees who were affected by Respondents' illegal implementations. . . . I shall order Powers to remove that discipline [for violation of the new "can bag" policy] from the employees' personnel files. . . ."

In a decision and order dated November 8, 1996, a three-member panel of the NLRB essentially adopted the reasoning and order of the ALJ. The Distributors' petition for review, and the NLRB's cross-petition for enforcement, followed shortly thereafter.

## III

■ It is particularly appropriate, in light of the parties' radically divergent views of the record evidence, to emphasize before addressing the merits of this case that we must enforce the NLRB's order as long as it is supported by substantial evidence on the record viewed as whole, even if evidence also exists that possibly could support a conclusion different from that reached by the NLRB. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 497, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

### A

■ The NLRA requires employers to bargain in good faith with the designated representative of a defined bargaining unit of the employer's employees. *See* 29 U.S.C. § 158(a)(5). The duty to bargain in good faith is limited to issues of wages, hours, and other terms and conditions of employment—the so-called mandatory subjects of bargaining. *See Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 210, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). However, when a party so strenuously refuses to bargain on a nonmandatory subject (such as the scope of the bargaining unit) that the result is an impasse, that party violates Section 8(a)(5) of the NLRA. *See NLRB v. Borg–Warner Corp.*, 356 U.S. 342, 348–50, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).

■ Following the principle that an impasse caused by absolute insistence on a particular bargaining unit is a violation of the duty to bargain in good faith, the NLRB and the courts have held that "joint bargaining" or "multiemployer bargaining"—either by a group of employers who refuse to bargain separately, or by a group of separate employ-

---

6. Among other things, the Distributors argued that the proposed amendment was time-barred by the six-month limitations period applicable to charges of unfair labor practices under the NLRA. The ALJ concluded that the amendment was not time barred, both because the Distributors had fraudulently concealed the existence and substance of the Pact, and because the multiemployer-bargaining allegation was closely related to the original allegations of the complaint.

ee bargaining units who refuse to do so—without the other party's consent constitutes unlawful insistence on a nonmandatory subject, namely, the expanded scope of the bargaining unit. *See, e.g. Utility Workers Local 111 (Ohio Power)*, 203 NLRB 230, 238, 1973 WL 4364 (1973), *enf'd*, 490 F.2d 1383 (6th Cir.1974) (finding union to have violated NLRA by "insisting that final settlements of the collective-bargaining contracts covering separate units of employees of Ohio Power, Central Operating, and Wheeling Electric be withheld until final agreement was reached between the Respondents and the Employers in all the units in which the bargaining was taking place."). On the other hand, both the NLRB and the courts also have recognized that "coordinated bargaining," a practice whereby parties share information and coordinate efforts but ultimately retain the authority to negotiate contract terms individually, is lawful under the NLRA. *See, e.g., General Electric Co.*, 173 NLRB 253 (1968), *enf'd*, 412 F.2d 512, 514 (2d Cir.1969).

■ The principal question presented by this case is whether the Pact created an unlawful multiemployer bargaining relationship among the Distributors, or whether the Pact merely reflected a lawful agreement to form a coordinated bargaining group within which each member would retain independent contract-making authority. There are no "magic words" that distinguish an agreement for unlawful multiemployer bargaining from a simple coordinated bargaining agreement. *See City Roofing Co.*, 222 NLRB 786, 789, 1976 WL 7790 (1976), *enf'd sub nom. NLRB v. R.O. Pyle Roofing Co.*, 560 F.2d 1370 (9th Cir.1977). Instead, the task of a reviewing agency or court is to examine the totality of the circumstances surrounding the agreement to determine whether the signatories truly retain independent bargaining authority, or whether the group of signatories retains effective veto power over the bargaining behavior of individual group members. *See Utility Workers*, 203 NLRB at 239 ("a policy such as uniformity, innocent in and of itself, can in context become a vital part of an illegal pattern of conduct").

Here, the record is replete with evidence that the Distributors in fact conducted unlawful multiemployer bargaining. For example, while the Pact specified several seemingly flexible bargaining goals, it also laid down several specific non-negotiable contract terms applicable to all Pact signatories. *See supra*, at 838 (specifying, for example, "[c]ooler and basement deliveries required," "no curfew," "no restrictions on number of part-time employees," and "common expiration date"). The Pact further provided a huge financial penalty to any Distributor that either deviated from any of the specific contract terms or negotiated directly with the Union; such a Distributor would have to pay $400,000 to each other party to the Pact, a total of $1.6 million for each violation.[7] Perhaps most tellingly, no Distributor ever offered a contract proposal different from that offered by every other Distributor; even when the Union made a proposal addressing an issue unique to a particular Distributor, an identical counterproposal was always forthcoming from all six Distributors.

Against this factual backdrop, the Distributors argue that the Pact in fact reflected only an innocent coordinated-bargaining strategy. The Distributors advance three principal arguments: first, they argue that the Pact did not actually confer "veto" power on the collective; second, they assert that, contrary to the ALJ's finding, the Distributors did not "reach[ ] an agreement ... about exactly what they wanted" in the Pact; and third, they contend that the Pact's requirement that the Distributors not negotiate "directly" with the Union did not necessarily preclude individual Distributors from reaching individual agreements with the Union. The Distributors' arguments misapprehend the scope of substantial-evidence review. The ALJ's conclusion that the Pact effectively conferred collective veto power on the Distributors is supported both by the Pact language imposing a $1.6 million fine on any Distributor that reached an agreement with the Union inconsistent with the express provisions set out in the Pact, and by the fact

7. Because Don Lee (Warren) and Don Lee (Dearborn) were owned by the same parent company, they collectively count as only one Distributor for purposes of the Pact.

that no Distributor provided an individual offer (even in the face of Distributor-unique proposals offered by the Union). With respect to the ALJ's finding that the Pact reflected an *ex ante* agreement on "exactly" what the Distributors wanted in their contracts, it is true that some of the Pact's contract provisions are vague (*e.g.*, "[m]ore restrictive grievance procedure"); however, other provisions are quite specific and leave no room for negotiation (*e.g.*, "[n]o curfew"). Finally, on the issue of whether the "no direct negotiation" clause precluded individual Distributors from reaching individual agreements with the Union, the ALJ certainly was entitled to infer from the Distributors' actual behavior that the Pact precluded such agreements. The fact is that, even when presented with Distributor-specific proposals that had no application or relevance to any other Distributor, each of the six Distributors responded with an identical counterproposal. On this record, there is at least substantial evidence—we would be more likely to call it overwhelming evidence—that the Distributors were engaged in unlawful multiemployer bargaining without the Union's consent.

**B**

■ The Distributors' secondary argument is that, even if their conduct constituted unlawful multiemployer bargaining, the General Counsel's complaint focusing on this charge was untimely. Section 10(b) of the NLRA provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge...." 29 U.S.C. § 160(b). "[T]he intended purpose of [Section 10(b)] is that, in the absence of a properly served charge on file, a party is assured that on any given day its liability under the Act is extinguished for any activities occurring more than six months before." *Chemung Contracting Corp.*, 291 NLRB 773, 774, 1988 WL 214227 (1988). Here, the Distributors argue that the multiemployer-bargaining charge is time barred because the Union should have been aware of the Pact by July 1990, but did not lodge a complaint with the Regional Director until April 1991. Alternatively, the Distributors argue that the six-month limita-

tions period ran between the date on which the Regional Director declined to file a complaint on the multiemployer-bargaining issue (October 1991) and the date on which the issue was revived via the General Counsel's motion to amend (February 1993). In response, the NLRB argues that it is entitled to tolling of the limitations period both because the multiemployer-bargaining allegation is closely related to other, timely-filed allegations contained in the complaint, and because the Distributors fraudulently concealed the substance of the Pact during the entire course of collective bargaining.

■ There are at least two generally recognized exceptions to the six-month filing rule. First, a complaint may be amended to add allegations relating to conduct more than six months old as long as the conduct occurred no more than six months before the filing of the charge underlying the complaint, and as long as the allegations in the amendment are closely related to that charge. *See, e.g., Henry Bierce Co. v. NLRB,* 23 F.3d 1101, 1108 n. 1 (6th Cir.1994); *Truck Drivers & Helpers Union. Local No. 170 v. NLRB,* 993 F.2d 990, 1000 (1st Cir.1993). Relying on its decision in *Redd–I, Inc.,* 290 NLRB 1115, 1988 WL 214320 (1988), the NLRB ruled here that the multiemployer-bargaining amendment was timely because it was closely related to the original charge's allegation of unilateral implementation of employment conditions before a bona fide impasse was reached. The NLRB reasoned that "the joint bargaining allegation is of the same class of violation in that it concerns negotiating conduct governed by Section 8(a)(5) of the Act; it involves the same factual setting and sequence of events, in that all the theories call for analysis of the entire course of bargaining; and the Respondents raised virtually the same defenses."

■ The Distributors' primary argument against application of the "closely related" exception to the six-month limitations period is that the date on which the Pact was signed (January 18, 1990) was almost 15 months before the date on which the original charge was filed (April 3, 1991). This argument is nonresponsive. The Union's complaint is

based not on the Distributors' act of signing the Pact, but on their behavior during the entire course of collective bargaining. It is undisputed that the alleged unfair labor practice of bargaining without disclosing the terms of a multiemployer-bargaining agreement occurred within six months of the date on which the original charge was filed, and therefore we are not persuaded by the Distributors' primary argument. Secondarily, the Distributors assert that there is insufficient factual commonality between the multiemployer-bargaining charge and the charges contained in the original complaint to support a "closely related" finding. Under the substantial evidence test, however, we must affirm the NLRB's decision because the record demonstrates that the amendment involved the same statutory provision, required assessment of the same Distributor conduct implicated in the original complaint charges, and demanded consideration of the same evidence. The amendment, after all, need not be identical to the charges contained in the original complaint; it need only be "closely related," and the NLRB has shown substantial evidence here that it is. *Cf. United States Can Co. v. NLRB*, 984 F.2d 864, 867 (7th Cir.1993) (affirming NLRB's finding that amendment was "closely related" to original complaint allegations because substantial evidence supported agency's finding that new allegations involved same basic employer conduct as old allegations).

 The second generally recognized exception to the six-month filing requirement is fraud, and we would be hard-pressed to disagree with the NLRB's finding that the Distributors fraudulently concealed the terms of the Pact. Fraudulent concealment of a material fact underlying an unfair-labor-practice charge tolls the six-month limitations period. *See, e.g., Ducane Heating Corp.*, 273 NLRB 1389, 1390 (1985), enf'd, 785 F.2d 304 (4th Cir.1986); *cf. Davis v. Smith's Transfer, Inc.*, 841 F.2d 139, 140 (6th Cir.1988) (recognizing fraudulent concealment doctrine but finding facts insufficient to toll limitations period). Here, the facts could scarcely be stronger in support of the NLRB's finding of fraudulent concealment. The Union repeatedly asked about the existence of a mutual aid pact, beginning with the very first collective bargaining session. The Distributors' responses were generally evasive (*e.g.*, Long's statement to Knox that the existence of the Pact was "none of his business and that it was not relevant to bargaining," *see* J.A. at 1556), and were sometimes downright untruthful (*e.g.*, the statement of two Distributor representatives that there was no mutual aid pact at all, *see id.* at 1780). During the Regional Director's investigation, no copy of the Pact was produced; it was not until an administrative subpoena was issued in connection with the hearing before the ALJ that anyone other than the Distributors saw the text of the Pact.

Even were we inclined to accept the Distributors' argument that the Union was on notice of the *existence* of some agreement, the record makes absolutely plain that the Distributors kept the *terms* of the Pact a closely-held secret. Not only did the Distributors go so far as to ignore a subpoena in another proceeding demanding production of a copy of the Pact, but Long and his associates flagrantly misrepresented the Pact's terms—going so far as to say, for example, that there was no penalty to any Distributor for negotiating directly with the Union, or for using a negotiator other than West Coast, *see* J.A. at 1674, when the Pact clearly prohibited such acts on pain of a substantial financial penalty. In the face of these facts, the Distributors' main argument against invocation of the fraud exception—that "[t]he Union and the General Counsel failed to exercise due diligence"—borders on the disingenuous. Moreover, it is no answer to say that the Union possibly knew that a pact existed when they clearly did not know its terms; the Union had no way to ascertain whether the Pact provided for lawful coordinated bargaining or unlawful multiemployer bargaining without knowing its precise terms. Accordingly, we hold that the NLRB correctly invoked the fraudulent concealment doctrine and properly permitted the complaint as amended to go forward.

## C

 The parties raise a number of other issues: the Union argues that Powers

Distributing's unilateral "can bag" policy was unlawful (independent of the legality of the Pact) and that certain conditions imposed by some of the Distributors were inconsistent with the Distributors' final offers, and the Distributors argue that the Union's own bad faith during the course of the collective bargaining precludes a finding against the Distributors. Because we affirm the NLRB's order finding that the Distributors' entire course of conduct was unlawful, and therefore that no valid impasse was reached that would permit any Distributor to implement a "final offer" unilaterally, we need not address the Union's arguments. With respect to the Distributors' argument, we agree with the District of Columbia Circuit that where a party to collective bargaining imposes an unlawful precondition to bargaining—as here, where the Distributors essentially conditioned bargaining on the Union's acceptance of the Distributors' multiemployer bargaining unit—that party's conduct excuses the other party's obligation to bargain in good faith. *See Local 777, Democratic U. Organizing Comm. v. NLRB*, 603 F.2d 862, 911 (D.C.Cir.1978).[8] The essence of the NLRB's ruling in this case is that, by secretly entering into a pact that restricted the right of the individual Distributors to negotiate with the Union, the Distributors collectively had agreed in advance not to budge on a nonmandatory bargaining subject. The Union's subsequent bad faith, if there were such, is therefore irrelevant.

## IV

For the foregoing reasons, the Distributors' petition for review of the NLRB's order is DENIED, and the NLRB's petition to enforce its order is GRANTED.

---

[8]. Unlike this case, the District of Columbia Circuit was confronted with a situation where the union, rather than the employer, imposed the unlawful precondition. The principle, however, is the same. Translating the District of Columbia Circuit's reasoning into the context of this case, we hold that "if [an employer] insists on speaking on behalf of persons for whom it cannot properly so insist, [a union] cannot be faulted for refusing to bargain." *Local 777*, 603 F.2d at 911 (quoting *NLRB v. Kelly Bros. Nurseries, Inc.*, 341 F.2d 433, 440 (2d Cir.1965) (Friendly, J.)).